## CONTINENTAL NAT. BANK & TRUST CO. OF CHICAGO v. OLNEY NAT. BANK.

Circuit Court of Appeals, Seventh Circuit.
May 21, 1929.

No. 4093.

Isaac S. Rothschild, of Chicago, Ill., for appellant.

Don Kenneth Jones, of Chicago, Ill., for appellee.

Before ALSCHULER and PAGE, Circuit Judges, and LUSE, District Judge.

PAGE, Circuit Judge. Appellee plaintiff, Olney National Bank, called Olney, brought this suit to recover from appellant defendant, Continental National Bank & Trust Company of Chicago, called Continental, the amount of two drafts, drawn March 7, 1924, by Olney on Continental's predecessor,

438

to the order of G. H. Hammond Company, called Hammond, and paid by Continental on indorsements admittedly not those of the payee. The jury was waived in writing, and judgment rendered in favor of Olney for the amount of the drafts and interest thereon from the date of payment.

It appears that Hammond, a corporation, was a packer and distributor of meats, and one C. Pardee was its traveling representative in western Michigan, with authority to make collections, some of which came to him in cash and some in checks. He possessed restricted authority from Hammond to indorse customers' checks by a rubber stamp reading as follows:

"Pay to order of any bank or trust company for exchange or cashier's check in favor of the G. H. Hammond Company.

"The G. H. Hammond Company,
  "Per ———.""

As early as 1911, Pardee kept his personal account in the Berrien County Bank, called Berrien, at Benton Harbor, Mich. From 1917 to 1924, Pardee purchased from Olney, a national bank located at Hartford, Mich., many drafts, payable to the order of Hammond. What he paid for any of them, other than the two here in question, does not appear. March 5, 1924, Pardee drew his checks on Berrien for $2,980.45 and $3,206.14, respectively, to the order of Hammond, and, after indorsing them with the rubber stamp, delivered them, for an undisclosed consideration, to the First State Bank of South Haven, Mich. That bank indorsed them to the order of Continental, and guaranteed all prior indorsements. March 6th, Continental charged them to the account of Berrien, and sent them to Berrien, where they arrived on the morning of March 7th.

In the afternoon of the same day, Pardee, in consideration of his two checks, drawn on Berrien, one for $2,970.60 and the other for $3,190.60, payable to the order of Hammond, and indorsed with the rubber stamp, obtained from Olney the drafts in question, one for $2,969.15 and the other for $3,189.10, drawn by Olney on Continental's predecessor in name, payable to the order of Hammond. Pardee, on the same day, indorsed those drafts "G. H. Hammond Co., per C. Pardee," and Berrien received and deposited them in his personal account. Berrien on the same day indorsed and sent them to Continental, guaranteeing all prior indorsements. Between 9 and 10 o'clock in the morning of March 8th, Continental wired Berrien that the Olney drafts were paid. Olney sent its two Pardee checks to Continental for collec-

tion and deposit on March 7th. They were presented to Berrien on March 10th, and protested for nonpayment. On that day Pardee suicided.

After receiving the telegram, advising him that the Olney drafts were paid, Rose, cashier of Berrien, twice called Olney's cashier, Ingalls, on the 'phone. Rose testified that he told Ingalls the Olney drafts had been deposited to the account of Pardee, and asked what Ingalls had received in payment therefor; that Ingalls replied that they had received Pardee's two checks upon Berrien; that he (Rose) then said, "They are not good at the present time." Rose also testified that he had a suspicion that Pardee was kiting checks, and the purpose of the second call to Olney was to make sure that Ingalls understood that those checks were not then good. Ingalls testified that Rose also said to him that Pardee had checked out the money. The most that Rose would say in denial thereof was that he did not remember making that statement.

Rose also testified that, after the telegram from Continental that the Olney drafts had been paid, he allocated to the payment of the South Haven Bank checks the proceeds of the Olney drafts, then in the Pardee account. Rose also testified that the money for the payment of the South Haven Bank's checks was not sent out until the afternoon of March 8th, some 24 hours after the deposit of the Olney drafts by Pardee, and 6 hours after Rose telephoned to Ingalls. Hammond disclaimed any interest in the drafts in question.

Between January 22, 1923, and February 29, 1924, Pardee, for a consideration not disclosed, procured from Olney 29 drafts, drawn on Continental and payable to the order of Hammond. They were all indorsed "G. H. Hammond Co., per C. Pardee," and deposited in Pardee's account in Berrien. Berrien indorsed them to Continental, and in each case guaranteed all prior indorsements. Those drafts were charged by Continental to Olney, and were returned to Olney and by it received, apparently without comment. Whether Olney is estopped here, because it did not object to those indorsements, presents the principal question.

Even if Olney owed Continental any duty to object to the payment of former drafts bearing similar indorsements, whether it was negligent with reference thereto was a question of fact, decided by the District Court adversely to Continental. Prudential Life Ins. Co. v. Nat. Bank of Commerce, 227 N. Y. 510, 125 N. E. 824, 829, 15 A. L. R. 146, cited, and quoted from with approval, by Continental. As a question of fact, it is not

here open for reconsideration. But if the question be held to be one of law, and not of fact, then it has been decided adversely to Continental in Critten v. Chemical Nat. Bank, 171 N. Y. 219, 228, 63 N. E. 969, 57 L. R. A. 529, cited by Continental, where it is held that the drawer bank owes the drawee bank no duty with reference to indorsements. United Security Life Ins. & Trust Co. v. Central Nat. Bank, 185 Pa. 586, 40 A. 97; First Nat. Bank v. Pease, 168 Ill. 40, 42, 48 N. E. 160.

It is urged that Olney knew that Pardee was without authority to indorse the drafts. The evidence is to the contrary. Although it is stipulated that Pardee had no authority to indorse, except the restricted authority to use the rubber stamp, yet it is not stipulated, or otherwise shown, that Olney knew that fact. It does appear, however, that every time a draft, and there were 29 of them, went to the Continental and was later returned to Olney, it bore the guarantee of Berrien, the beneficiary of the Hammond indorsement, that the indorsement was genuine.

■ It is contended that Olney should not recover, because it lost its money by taking worthless checks from Pardee for its drafts. The consideration given for the Pardee checks was the drafts, and, if the checks were worthless, that would seem to be the best possible reason why the drafts should not have been paid. But, aside from that question, it appears that, until it was paid out on the drafts, Continental had on deposit money belonging to Olney, equal to the amount of the drafts, and the suit is not upon the drafts, but it is to recover that money because of Continental's wrongful refusal to pay it to Olney, upon demand. The only excuse for the refusal is that it paid the money out upon the drafts. A draft, drawn to order, is not payable at all until it is properly indorsed by the payee, and it is conceded in this case that the burden to determine whether it was properly indorsed was upon Continental. We can see no possible relation between the question as to what consideration the drawer of a draft received for it, and the duty of the drawee to recognize and obey the drawer's direction as to the person to whom a draft is to be paid. If those drafts had been a gift, or for any other reason drawn without any consideration, or for a consideration that failed, the drawee could not ignore the drawer's order, and then defend on the ground that the drawee received no value for the drafts.

It is also urged that Olney lost its money because it did not act promptly when the cashier of Berrien told the cashier of Olney that the checks were not good. The theory upon which that contention is made is that the proceeds of the drafts, deposited in Pardee's account with Berrien, were not actually paid out until some six hours after Rose told Ingalls that the money had been already checked out, and that the checks were not then good. What Olney would have done if Rose had told Ingalls that the proceeds of the drafts were still in the Berrien bank, it is unnecessary to conjecture, because Rose did not tell Ingalls that very important fact, but he did tell him that the money had been already checked out, or, what amounted to the same thing, that the money was not there to pay the Pardee checks to Olney.

■ Section 9 of the Illinois Negotiable Instrument Law provides: "The instrument is payable to bearer: * * * (3) When it is payable to the order of a person known by the drawer or maker to be fictitious or non-existent or of a living person not intended to have any interest in it." Cahill's Ill. Revised Stats. 1927, p. 1735, c. 98, par. 29.

The contention is that Hammond was "a living person, not intended to have any interest in" the drafts, and, in consequence, the drafts were payable to bearer. It is claimed that, applied to this case, the intention that Hammond should not have any interest in the drafts, means that such was the intention of Pardee, and that the intention of Olney, the drawer of the drafts, had nothing to do with it. We are of opinion that the language of the act has relation to the intention of the drawer of the drafts, and not to the intention of Pardee, who was neither drawer, drawee, or payee, but who procured them to be made payable to Hammond. But the question as to what the intention was with reference to the interest, if any, that Hammond was to have in the drafts, is a question of fact, that is not reviewable here.

■ Continental, for a reversal because of allowance of interest, relies upon the provisions of section 2 of the Illinois Interest Act, which, so far as here material, has been the same, with slight exceptions, since the Revised Statutes of 1845. The statute reads:

"Sec. 2. Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due * * * on money lent [or advanced for the use of another]; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance [;] on money received to the use of another, and retained without the owner's knowledge, and on money withheld by an unreasonable and vexatious delay of

payment." Cahill's Ill. Revised Stats. 1927, p. 1530, c. 74, par. 2.

The words within the brackets were put into the statute either in the revision of 1874 or prior thereto, and were not in the statute of 1845. The semicolon and the brackets are ours. The semicolon was in the act of 1845, but was omitted from the amendment of 1891, and has not appeared since. Starr & Curtis' Illinois Statutes, published in 1892, contains below section 2 the following note: "Amendment of 1891 changes rate of interest from 6 to 5 per cent." No mention is made of the omission of the semicolon after the word "balance." We are of opinion that, whether the semicolon was omitted by design or inadvertently can make no difference in the construction that must be placed upon this statute, and that, within the language above quoted, there are to be found four cases in which interest is to be allowed without agreement: (1) On money lent or advanced for the use of another; (2) on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; (3) on money received to the use of another and retained without the owner's knowledge; and (4) on money withheld by an unreasonable and vexatious delay of payment.

In Heywood v. Old Colony Trust & Savings Bank, 204 Ill. App. 300, it was held that, where a bank wrongfully refused payment of a check, interest should be allowed, either upon the theory that there was an unreasonable and vexatious delay in withholding payment, or on the theory that interest would be allowed on money received to the use of another. But as to whether there was vexatious delay presented a question of fact, which was determined by the District Court, and is not reviewable here.

The judgment of the District Court is affirmed.