THE HOME INDEMNITY COMPANY, Appellant, v. THE STATE BANK OF FORT DODGE, Appellee.

THE HOME INDEMNITY COMPANY et al., Appellants, v. THE STATE BANK OF FORT DODGE, Appellee.

No. 45977.

104

106

APRIL 6, 1943.

Horace J. Melton, of Fort Dodge, for appellants.

D. M. Kelleher, of Fort Dodge, for appellee.

BLISS, J.—The Brady Company, with its headquarters at Fort Dodge, Iowa, conducts an extensive motor-freight business. The policy of the Indemnity Company insured the Brady Company and also the Fort Dodge National Bank, in which the former carried its checking account against which all checks in controversy were drawn, against losses sustained by either because of "FORGERY or ALTERATION of, on, or in any check * * * made or drawn by, or drawn upon or as a direction to the Insured [Brady Co.] * * * including (a) Any check made or drawn in the name of the Insured, payable to a fictitious payee and endorsed in the name of such fictitious payee * * *." The policy provided that losses sustained by the insured should be entitled to priority over losses sustained by the bank and that losses to either should be paid directly to the insured. The bond covered checks written prior to July 1, 1940.

The other plaintiff, the Bonding Company, carried a policy,

effective from June 27, 1940, insuring the Brady Company against any loss of money caused by the dishonesty of any employee through forgery, larceny, etc. Each policy provided that, upon indemnification, the insured would render such assistance, by assignment or otherwise, to secure reimbursement to the insurers.

On January 25, 1941, the Brady Company executed a written assignment to the Indemnity Company transferring to it "all the right, title and interest of the Brady Company in and to, all and singular, the checks drawn by the undersigned * * * on the Fort Dodge National Bank * * * set forth and described in the attached list," for which claim was made by the insured on September 24, 1940. This claim listed eighty-seven checks, totaling $1,318.51, averaging about $15 each, and gave the numbers, dates, payees, and amounts of the checks. On the same date the Brady Company executed a like assignment to the plaintiffs covering a list of twenty-seven checks totaling $740.16, included in the claim of the insured against the Bonding Company of October 14, 1940. Of the checks covered by these assignments only fifty-one thereof are involved in this litigation, the first one of which is dated February 13, 1940, and the last one July 31, 1940.

Each year claims involving damages for loss or injury to goods, delay in delivery, overcharges, etc., approximating $39,-000, were filed against the Brady Company. Attention to these claims required a separate department with a manager, investigators, and various assistants. Sometime late in 1939, Brady Company advertised for a clerk. S. B. Noland contacted the company, and gave acceptable references. He was a paroled convict who had served a sentence for forgery. John J. Brady, president of the company, signed the employment papers with the board of parole. While it was stipulated at the beginning of the trial that the company and its president knew that the crime of which Noland had been convicted was forgery, Brady testified that he had not known what Noland's offense was, and that he had never attended to the details of hiring him. For about the first sixty days of his employment Noland worked in the pay-roll department in connection with social-security

matters. Sometime in January 1940, he was placed in charge of the claim department.

It was the practice of the company, when any claim was made, to give it a consecutive number and make a file for it and for all papers, such as bills of lading, invoices, reports of investigators, correspondence, etc., in connection with the claim, all of which were clipped together. The top sheet of the file was a printed blank form, supplied by the company, entitled, at the top, "Disposition of Claim." The blanks below were filled out in writing with the claimant's name, claim number, amount, date of filing, date of approval, and other data. At the bottom of this top sheet was a blank for the initials of the company representative who approved the claim. When the claim was paid, that fact, with the date and check number, was rubber-stamped on the face of the sheet. The claim file was then placed, according to its consecutive number, in a file cabinet. A registry book was kept in the office of the department, in which every claim, when numbered and filed, was recorded so as to show, in substance, the matters noted on the "disposition of claim sheet." When a claim was paid, that fact was noted on its registry sheet, showing date and amount of payment and check number. Irene E. Lamuth was cashier of the company and had been for ten years. She had two or three assistants. Only she, and an assistant in her absence, and the president, were authorized to sign the company checks.

When a claim had been approved, one of the assistants of the manager of the claim department would take the entire original file to the cashier's office. Usually a number of these approved-claim files were taken to the cashier at one time and left. One of the cashier's assistants would type the checks, put in the amounts by protectograph, and when the checks were signed by the cashier an assistant would return the files, with the checks, to the claim department for delivery of the checks to the claimants.

It was the rule of the company that the manager of the claim department was authorized to approve all claims of $20 or less, and procure checks therefor and make remittances without securing the further approval of any of his superiors.

The plan used by Noland to defraud the company was to

procure from the paid-claim files one of the original files of a claim which had been rejected, or settled and paid, and stored away some months or a year or more previous. He would remove the top, or "disposition of claim" sheet, which had the stamp of payment thereon, and would substitute a new top sheet, similar in all respects to the one removed but lacking the paid stamp, and usually with the amount of the claim changed, and place his initialed O. K. thereon. He would then send this file with other legitimate claim files to the cashier, and when the files with the checks would be returned to his department he would take the check issued to the payee named in the spurious claim, forge the endorsement of the payee, negotiate the check, and take the proceeds. Almost always he used the name of a claimant whose claim had been allowed or rejected, but a few times the name used was apparently fictitious. The papers in the file below the top sheet were usually not tampered with except to add or alter a figure in the amount of the claim to conform to the substituted top sheet. There were, of course, a great many legitimate claims allowed and paid. The files and the registry book of current claims were at times referred to by the cashier or officers of the company in the disposition of claims. An examination of the paid-claim files, or the registry record thereof, which files were used by Noland to procure the checks which he stole, would have disclosed the fraudulent plan. The cashier was not required to investigate the verity of any claim presented to her by the claim department which bore the initialed O. K. of Noland or of certain designated officers. This was the order which Mr. Brady gave to her. Most of these spurious top sheets had the O. K. of Noland, some that of a higher officer, and some had both. The cashier often consulted with her superiors and others about claims. About every six months certified public accountants audited the books of the company. Noland left the employ of the company apparently early in August 1940. The public accountants came shortly afterward but the record does not disclose that they detected the fraud of Noland. The first intimation of his misdeeds came when a claimant complained, sometime in September 1940, because his claim had not been paid.

He was told that his claim had been paid, and a canceled check payable to him, dated July 5, 1940, with his name endorsed thereon, was shown to him. It is one of the checks involved herein and is the only check for a valid claim. Being convinced that the claimant had never received the check or endorsed it, another check was issued to him on September 30, 1940.

The checks involved herein all came to the defendant. It was stipulated: that each of the payees, who were known, would testify that he never received the check or endorsed it; that each person endorsing the check after the purported endorsement of the payee acted in good faith in taking the check, and paid full value therefor; that the holders presented the checks to the defendant, who took them for collection in the customary manner in which checks drawn upon the Fort Dodge National Bank are received from defendant's depositors; that defendant's tellers and bookkeepers had no knowledge that the checks were issued for spurious claims and to spurious payees; and that none of defendant's officers had any transactions with Noland, or knew him or his criminal record.

Noland never signed any of the checks. He had no authority to issue or sign checks. He never endorsed his name on any of the checks.

When the canceled checks, with the bank statement, were returned to the company by the drawee bank, it was the duty of the cashier and her assistants to examine them for errors and to verify the amounts and the signature of the maker or signer. Neither Noland nor any other employee or officer of the company took any part in this checking of the vouchers. There was no attempt to scan the endorsements.

Sometime in September 1940, Jones, an investigator of the Brady Company, came to the defendant with checks in the amount of about $900 which he said were forged. He was seeking information, and did not leave them. An officer of defendant told Jones that if they were forged they would be handled in the usual course of business, and if they were returned to the Fort Dodge National Bank they would be returned to the defendant and it would return them to its customers. By letter dated February 14, 1941, an attorney for the plaintiffs informed the defendant that the plaintiffs had

paid the Brady Company its loss on the forged checks, which totaled $964.88, which checks were issued between February 13th and July 31, 1940, and that it was his opinion that defendant was liable to plaintiffs for the collection of the checks out of the Brady Company deposit account. He demanded payment of this sum within a week, and stated that plaintiffs would bring suit by February 22, 1941, unless payment was made. He further stated that each payee had made affidavit that his purported endorsement was a forgery, and stated that these affidavits and the checks were at his office and available for personal examination by any attorney or officer of the defendant. Nothing was apparently done by defendant and these actions were thereafter brought.

The action of the Indemnity Company involves forty checks sued on in separate counts of the petition, which alleged the existence of the indemnity policy, the indemnification of the insured for the losses suffered from the depletion of its deposit account in the drawee bank through the payment to the defendant of checks drawn upon said account by Brady Company and issued to payees who never received or endorsed said checks, but whose endorsements thereon were forged, and thereafter acquired by defendant and presented by it to the drawee and paid by the latter. The petition alleged, respecting each check, that " * * * the defendant, through the wrongful act of the forger, wrongfully and unlawfully obtained possession of the check and thereupon, after its subsequent endorsement, wrongfully and unlawfully collected and received the proceeds of the same and appropriated and converted said proceeds to its own use, thereby damaging the Brady Company in the amount of * * * [the face of the check], no part of which has been paid by defendant." The petition further alleged that the plaintiff, upon its payment of the losses thus suffered by the Brady Company, received from the latter the said checks and a written assignment from it of all its right, title, and interest therein, and by reason of said matters the defendant is indebted to plaintiff in the aggregate amount of said checks with lawful interest from the date of said payment and conversion. In compliance with ruling on a motion of defendant for more specific statement, the plaintiff, by amendment to its petition, alleged:

"That the name of the employe of the Brady Company into [whose] hands the checks came other than the payee was S. B. Noland; that he was supposed to mail said checks to each of the payees; that he was instrumental in obtaining the issuance of the checks by the officials of the drawer, the Brady Company, authorized to issue and sign the said checks, but upon the false and fraudulent representations that, in each instance, the amount of each check was, in fact, owing to the person named therein as payee; that in fact, the drawer was not actually indebted for the amount of the check to the person, firm or corporation therein named as payee."

The joint action seeks recovery on eleven checks, upon allegations of the petition substantially like those in the pleadings of the Indemnity Company.

The answers of the defendant are, in substance, the same in each action. They deny generally that plaintiffs are entitled to the relief prayed for on any facts alleged. They allege that the checks were bearer paper because the payees were fictitious to the knowledge and intent of the persons making them so payable, and the matter of endorsement was therefore immaterial; that the proximate cause of any loss sustained by the Brady Company was the negligent conduct of its officers in permitting Noland to make effective his fraudulent plan by issuing spurious checks and entrusting them to him to put into circulation and thereby inducing defendant to believe that the checks evidenced genuine transactions; that the Brady Company was negligent in failing to supervise Noland's work, and in failing to carefully verify the canceled checks and compare them with its records, and in permitting its drawee bank to honor said checks over a long period of time, thus preventing it from charging them back to its customers.

At the close of the evidence each side moved for a directed verdict and the motion of the defendant was granted. The motion was apparently sustained on the ground that the Brady Company was negligent.

Inasmuch as the record clearly establishes that the checks involved were issued in the manner set forth herein, that the endorsements of the payees were forged, and by reason of their

subsequent negotiation they came into the possession of the appellee, who gave cash or credit to its respective endorsers and presented the checks to and received payment thereof from the drawee, and thereafter appropriated and converted the proceeds of said checks to its own use, to the unrecompensed damage of the appellants in the full amount of said checks, we will discuss first the propositions asserted by the appellee in support of its judgment.

I. The appellee contends that it did not take title to the checks but received them only as an agent for collection and gave only provisional credit and that there can be no recovery against it in the capacity in which it was acting. We do not agree with either its conclusion of fact or of law. The matters of fact on this phase of the case are covered by a stipulation of the parties, and by evidence which it was agreed either party might introduce to supplement the stipulation. This evidence consists of the checks, which were introduced as exhibits and certified to this court, and by the testimony of an assistant cashier of appellee, all of which were offered by appellants. It appears from the record, without dispute, that none of the checks were presented to the appellee by Noland. All of them bore the forged endorsement of the respective payees and the endorsements of one or more other holders. It also appears that, with the exception of perhaps six or seven of the checks which came to the appellee from outside correspondent banks, the last endorser of each check was a local depositor of the appellee, and the latter received said check for deposit and gave credit therefor to the depositor in his account, which credit was conditioned upon the drawee bank's honoring the check, as the appellee reserved the right to charge back to the account of the depositor the amount of the check in case it was dishonored by the drawee bank. It also appears by stipulation that each of these checks was honored by the drawee and was paid by it to the appellee through the customary clearing-house credit arrangement between the appellee and the drawee, and the conditional credit given to the depositor of each check became a final credit in its deposit account with the appellee. Sometimes when one of these checks was received by the appellee the holder would receive

part of it in cash and the balance would be deposited to his credit. There never was but one entry made in the books of the appellee when one of these checks was received, and that would be as a credit item in the depositor's account. When the check would be presented by a depositor, he would list the item on his deposit slip and it would be noted in his passbook. The record also shows that the correspondent bank which sent in most of the few checks which were cashed outside of Fort Dodge carried an account with the appellee, and the latter carried an account with it, and each ordinarily credited or debited the account of the other with items which passed through them. It also appears from an examination of the checks that the last holder, who presented any of them to the appellee for deposit, placed his blank, unqualified, endorsement thereon. Not one of the checks bears an endorsement for collection only, or any other qualified or restrictive endorsement whatsoever. As noted, the last endorsement on each check was a blank endorsement consisting of merely the name of the endorser, and therefore transferable by delivery. The appellee placed no endorsement on any of these checks, but merely placed its paid stamp on each check before passing it through the clearing house and delivering it to the drawee. These checks were received by the appellee, so far as the record shows, just as it received checks for deposit from any other depositor. They were received for deposit. Of course, it was necessary to collect them where they were drawn upon another bank. But it was the intention of the holder and of the appellee that they were delivered and received for deposit to the credit of the depositor in his account. Appellants placed on the witness stand an assistant cashier of the bank, who had been such officer since 1934. He testified that, "These 51 checks all came from depositors, doing business and the like around town." The appellee took title to these checks when it received them for deposit and the proceeds became its property. As noted, it in some instances paid out cash to the depositor. It permitted the depositor to draw at once upon his account after depositing the check, as appears from the testimony of this assistant cashier, to wit:

"Q. Now, when a depositor deposits money under a gen-

eral endorsement at your bank, he has a right to draw on that immediately, doesn't he? A. If a depositor carries a satisfactory account, we make no notations, *but he draws immediately.*"

This testimony was in no way qualified in cross-examination. The defense that appellee was merely the collection agent of the last endorser was an affirmative defense pleaded by it. The burden was upon it to establish such defense. It has wholly failed to do so. Such defense is refuted by the fact that it received the checks on blank endorsements only. Appellee acted as a collector with respect to these checks, just as it acted as a collector of checks for every other depositor, and that was for the purpose of deposit. It was a collector in that restricted sense. The testimony of the assistant cashier clearly establishes this. He testified that, "Our bank acts as a collector to the extent of charging it back to our customer or if by chance we have cashed it we go and get the money."

The appellee, of course, never had valid title or right to these checks, or to the proceeds thereof, because it received and held them under forged endorsements of the payees. For the same reason, the last endorser and depositor of any of these checks had no title or right to the checks or to the proceeds thereof. Nevertheless, the appellee treated the checks and the proceeds as though it owned them in its own right and not as the collecting agent of the last endorsers. The fact that it reserved the right to charge any dishonored check back to the account of the depositor does not change its status toward such check.

There can be no question of the soundness of our conclusion in this matter. It is fully sustained by the decisions of this court and by the great weight of authority everywhere.

In Andrew v. Security Tr. & Sav. Bk., 214 Iowa 1199, 1202, 1203, 243 N. W. 542, 544, the checks which were deposited had no restrictive endorsements. They were credited to the depositor's account, and he was permitted to check upon it. The court said:

"As to the checks the relationship between the bank and interveners was that of endorser and endorsee, and as to the

balance of the credit interveners had the right to check against it and the relationship was that of debtor and creditor. Acme H. & M. F. Co. v. Metropolitan Nat. Bank, 198 Iowa 1337; Andrew v. Marshalltown State Bank, 204 Iowa 1190, 1193; Burton v. United States, 196 U. S. 283; 7 C. J. 599. Such was the relationship although the bank by express or implied agreement reserved the right to charge back the checks if dishonored. Interveners had the credit. The bank had the title to the checks, although both the interveners' credit and the bank's title were conditional. Bellevue Bank v. Bank, 168 Iowa 707, 715; * * * Tropena v. Keokuk Nat. Bank, 203 Iowa 701, 703. [Citing other cases.] The agreement for charging back in case of dishonor amounted only to a summary remedy for enforcing the endorsement. It did not operate to withhold from the bank the ownership of the paper.''

Without further quotation, we call attention to other decisions and authorities fully sustaining the above-noted holding of this court. See Burton v. United States, 196 U. S. 283, 25 S. Ct. 243, 49 L. Ed. 482, 488, 489; City of Douglas v. Federal Reserve Bank, 271 U. S. 489, 46 S. Ct. 554, 70 L. Ed. 1051; 9 C. J. S., Banks and Banking, 472–475, section 221; id. 476, section 222; id. 583–585, section 281; 7 Am. Jur., Banks, 503, 504, section 696; id. 505, section 697.

Where the forwarding and collecting banks have reciprocal accounts, and the collecting bank on receipt of payment gives credit on its books to the forwarding bank and the forwarding bank charges the collecting bank on its books, the banks settling with one another from time to time in accordance with the accumulated balance, the relation of the banks is that of debtor and creditor. 9 C. J. S., Banks and Banking, 497, 498, section 242.

Our conclusion in the matter as herein stated has complete support in Acme Hay & Mill Feed Co. v. Metropolitan Nat. Bk., 198 Iowa 1337–1344, 201 N. W. 129, where it is fully discussed, with quotations from 2 Michie on Banks and Banking, section 127; 2 Morse on Banks and Banking, 5th Ed., section 575, and with a page of decisions from other jurisdictions, and other decisions from this court. See, also, Andrew v.

Marshalltown State Bk., 204 Iowa 1190, 1193, 216 N. W. 723; Thompson v. Cedar Rapids Nat. Bk., 207 Iowa 786, 223 N. W. 517; Leach v. Iowa State Sav. Bk., 202 Iowa 894, 211 N. W. 517; Leach v. Battle Creek Sav. Bk., 202 Iowa 871, 211 N. W. 519.

Under the record made, the appellee failed to sustain its burden of establishing that it was merely the agent of the last endorsers for the collection of the checks. On the other hand, it is clearly established that the relationship was that of debtor and creditor, and that the appellee, although having no title to the checks because of the forged endorsements, treated the checks and the proceeds thereof which it had collected as though it had full title and ownership. In our judgment, there is no merit to this defense. We are not conceding that, if the appellee had been merely a collecting agent, under the circumstances of the case, the appellants would not have the right to recover.

II. Appellee also urges that the appellants received nothing by their assignment and can base no action thereon, because this instrument merely assigned and transferred all the right, title, and interest of the Brady Company in and to the checks in controversy, and did not assign any cause of action based thereon which the assignor may have had. This contention of the appellee has little to recommend it.

In National Surety Co. v. Bankers Trust Co., 210 Iowa 323, 328, 329, 228 N. W. 635, 637, the circumstances and the nature of the action were very similar to the case before us. In that case the plaintiff had issued to the Des Moines Life & Annuity Company a fidelity bond insuring it against loss sustained by it through the commission of forgery by any of its employees. One of them secured possession of bank drafts payable to his employer and forged its endorsements thereon and deposited the same to his credit in the defendant. Plaintiff paid the loss to the insured as provided in its policy, and took an assignment from the insured of "all its right, title and interest in and to the * * * cashier's checks and drafts." It then brought action at law against the defendant. The defendant demurred to the petition because the assignment did not vest any right of action in the plaintiff. The plaintiff then amended its petition

by alleging that the assignment was intended to cover and assign not only the instruments described but all causes of action growing out of them. This amendment was stricken. This court reversed. After stating that the defendant had acquired no title to the checks and drafts because of the forged endorsements, as provided in section 9483, Code, 1927, and had paid them at its peril, the court said:

"This provision makes the forged signature inoperative, and the inhibition precludes a recovery on the instrument against any person where the right of recovery is predicated on such inoperative signature. It is apparent from the petition that the defendant bank secured its apparent title through forged indorsements. Clearly, a cause of action existed in the Annuity Company against the defendant bank, and the liability of the latter did continue after the payment of the indemnity to the insured Annuity Company. This is not a case involving double payment. The right to the proceeds, arising from the liability of the bank, if any, to the Annuity Company, was simply a matter to be adjusted between the parties to the indemnity contract. They did adjust it by the assignment in question, and the reference therein to 'cashier's checks and drafts' is merely descriptive. The thing assigned was a cause of action for money had and received, or for conversion, at the election of the Annuity Company. The Annuity Company continued to own the drafts, and continued all of its cause of action thereon, whether in tort or on ratification for money had and received. The bank had a liability to the Annuity Company, and the assignment simply gave the Surety Company the right to enforce such action which the Annuity Company had at that time against the defendant bank."

The reasoning and judgment of the court are sound and are controlling on this point.

III. Section 9469 (section 9, Negotiable Instruments Law), Code, 1939, provides:

"The instrument is payable to bearer: * * *
"3. When it is payable to the order of a fictitious or non-

existing person, and such fact was known to the person making it so payable * * *.''

Appellee therefore contends that all of the checks in controversy were payable to bearer, because Noland was the person who directed the cashier to make the checks as they were drawn, and as it was his act and intention to make them payable to persons not entitled to them, and therefore fictitious, in law he was the person making the checks ''so payable.''

There is no merit in this contention. It may be conceded that the rule has been definitely established and consistently followed that a check drawn payable to a payee who is an existing person but who is not entitled to the check and is not to get it is payable to a fictitious payee. But even though such person is a fictitious payee, the check is not necessarily payable to bearer. Because, as the said Code section provides, the check will not be payable to bearer, unless the person ''making it so payable'' knew that the person named as payee was fictitious or nonexisting.

Who is the ''person'' who ''makes'' such a check ''so payable''? Is such person an employee who is merely authorized as a part of his duties to requisition the issuance of his employer's check by one authorized to do so, or is it the employer who draws or makes the check, or such person as the employer has authorized to affix the latter's signature and issue it?

The parties stipulated that all checks involved were signed and issued by the person or persons designated by Brady Company to sign and issue its checks. Noland was not authorized to sign checks for the company and he signed none. Its cashier signed and issued all checks involved in these actions.

Appellee contends that the knowledge of Noland that the persons designated by him as payees were not claimants against the company and were not entitled to the checks, and his intention that they should not receive the checks, were the knowledge and intention of the Brady Company, and that when it issued these checks, by its cashier, it knew the payees were fictitious, and the checks were, consequently, payable to bearer.

The appellants insist that this contention of the appellee is without basis or merit, and that this knowledge and intention

of Noland were not attributable to the Brady Company, or to its cashier or to any of its officers, and that so far as the company, its cashier, officers, or employees other than Noland knew, the payees named in the checks were legitimate claimants and the checks were issued with the sole intention of being delivered to them in payment of their claims. There is no claim that the company or anyone connected with it, other than Noland, had any actual knowledge of his fraudulent intentions or conduct. It is the position of the appellants that, under the facts and the record herein, the Brady Company was bound only by the knowledge and intention of the cashier in the execution and issuance of these checks, and that she, rightfully acting for the company, was the person who made the checks so payable.

The language of the quoted portion of the section is not free from ambiguity, but this court has quite clearly indicated its construction of the language. In American Express Co. v. Peoples Sav. Bk., 192 Iowa 366, 368, 369, 181 N. W. 701, 703, the court, in construing the section (3060-a9, Code Supp., 1913) said:

"Were the instruments in suit payable to bearer? The drafts in question are negotiable in form, and payable either to fictitious or nonexisting persons. When a draft is payable to the order of a fictitious or nonexisting person, and such fact *is known* to the *drawer,* it is payable to bearer. Section 3060-a9. * * * The plaintiff company, as drawer, intended that these drafts should be paid to the named payees, and not to the purchaser, Crozer, and it was not known by the drawer that these drafts were payable to the order of fictitious or nonexisting payees. This being true, the drafts were not payable to bearer. Were they payable to Crozer himself, so that his indorsements of them are valid? No doubt he intended them to be so payable, although he indorsed by writing the names of the payees, and added to the first draft his own name. In other words, Crozer himself intended to be the payee, but the drawer did not intend to make him so. If, in fact, there was a genuine firm, it alone could indorse; if there was not a genuine firm, then nobody could indorse. The drafts would not be payable to bearer, because the drawer did not know that the payees were fictitious

or nonexisting. They would not be payable to Crozer, because the drawer did' not intend that the drafts should be so payable. See Seaboard Nat. Bank v. Bank of America, 193 N. Y. 26 (85 N. E. 829); Shipman v. Bank, 126 N. Y. 318 (27 N. E. 371); United Cigar Stores Co. v. American Raw Silk Co., 184 App. Div. 217 (171 N. Y. Supp. 840). The intent of the drawer is the test, and this intention must necessarily arise from knowledge, and exist as an affirmative fact in the mind of the drawer at the time of the delivery of the paper.''

While there was a different result on the retrial of this case, it was then conclusively established that both the plaintiff and the defendant knew that the payees were fictitious, and that Crozer was the agent of the plaintiff in the transaction. American Express Co. v. Peoples Sav. Bk., 200 Iowa 408, 205 N. W. 1.

In New Amsterdam Cas. Co. v. Albia State Bank, 214 Iowa 541, 239 N. W. 4, 242 N. W. 538, the plaintiff sued as the assignee of Monroe county, which was the depositor and the drawer of the check on the defendant bank. This check was issued by the treasurer of the county upon the requisition of the county auditor, who was authorized by statute to make real-estate-mortgage loans from the school fund. He forged the note and mortgage of George Lucas and wife, and upon presentation of the instruments to the county treasurer, secured the check payable to Lucas. The auditor then forged the endorsement of Lucas and cashed the check. It is of some significance that no claim was made by the defendant that the check was payable to bearer on the ground that the intention of the auditor to designate a fictitious payee was attributable to Monroe county or to its treasurer.

In Erickson Co. v. Iowa Nat. Bk., 211 Iowa 495, 230 N. W. 342, the person who prepared the company checks and designated the payees therein was an official of the plaintiff and performed the duties of a cost accountant and pay-roll clerk. He made up the pay-roll sheet twice a month, designating the employees entitled to the pay checks, and presented the checks to the treasurer to be signed by him. He padded the pay roll with the names of former employees not entitled to pay and made checks payable to them, although he never intended that

they should receive the checks, and they did not receive them because he took them and forged the endorsements of the payees and collected the money. It is significant that neither this court nor the defendant made any claim that the knowledge and intentions of the embezzling official were attributable to the company, and that the checks were payable to bearer. If that were sound law, it would have been an easy way to dispose of the case. The relationship and duties of the defaulting official in that case to his employer were very like unto those of Noland in this case.

In McCornack v. Central State Bank, 203 Iowa 833, 211 N. W. 542, 52 A. L. R. 1297, a trusted agent of the plaintiff represented to him that one Kutsman wished to borrow money on his note secured by a real-estate mortgage. He forged the security papers and procured from the plaintiff a check payable to Kutsman, which he cashed by forging the endorsement of Kutsman. Justice Evans, in his dissent, at page 853 of 203 Iowa, page 551 of 211 N. W., spoke of the transaction thus:

"This plaintiff drew his check unwittingly to a fictitious payee, and put it in circulation by delivery to a trusted servant, who proved to be a very unfaithful one."

The payee was purely fictitious, and the "trusted servant" knew it, yet no contention was made by this court or any member thereof that the knowledge or intention on the part of the one designating the payee was to be attributed to the plaintiff, who was the drawer of the check. The court said, at pages 837, 838 of 203 Iowa, page 545 of 211 N. W.:

"A check payable to the order of a fictitious person with the knowledge of the drawer is payable to bearer. Section 9469, Code of 1924. But where the fact that it is payable to a fictitious person is unknown to the drawer, the bank upon which it is drawn, on paying it, is in no different position from where it pays a check payable to a real party upon a forged indorsement. Shipman v. Bank of State of New York, supra [126 N. Y. 318, 27 N. E. 371, 12 L. R. A. 791]; Harmon v. Old Detroit Nat. Bank, supra [153 Mich. 73, 17 L. R. A., N. S., 514]; Los Angeles Inv. Co. v. Home Sav. Bank, 180 Cal.

601 (182 Pac. 293); American Exp. Co. v. Peoples Sav. Bank, supra [192 Iowa 366, 181 N. W. 281]; Robertson Banking Co. v. Brasfield, 202 Ala. 167 (79 So. 51). McCornack did not know that the payee was a fictitious person; the check was not, therefore, payable to bearer; and the bank cannot escape liability upon that ground.''

In McLaughlin-Gormley-King Co. v. Hauser, 195 Iowa 224, 228, 191 N. W. 880, 882, the court said:

''If the fictitious character or nonexistence of the payee was not known to the maker, then impliedly the instrument is not payable to bearer.''

All of the checks involved in the appeal before us were payable to specified persons or to their order. None of them purported to be payable to anyone other than an actual person. On their face the checks were payable to order. Section 9468, Code of 1939.

As manager of the claim department it was Noland's duty, with the aid of his assistants, to make a record of all claims filed, to investigate their validity, to reject them, or to allow them in the amount which the investigation warranted, and to approve them himself, or submit them to certain of his superiors for additional approval if the allowance was above a specified amount. After receiving the checks from the cashier it was his duty to deliver them to the payees. This was the scope of his work and his duties. He had authority to pass only upon claims presented by claimants, and to allow and present only such claims to the cashier for payment. He had no authority to endorse any of the checks which he received from the cashier.

It is the argument of the appellee that it was the intention of Noland which controlled, and that it was his intention which was the intention of the Brady Company, notwithstanding everything which he contemplated and everything which he did with respect to these checks was against the interest of the company, and with the object of unjustly enriching himself and of wrongfully depriving the company of its property. It argues, contrary to the generally accepted and

well-recognized principle of law, that the secret knowledge of Noland to cheat and defraud his employer was the knowledge of his employer. In other words, it advances the doctrine that when the company, through its cashier, executed or issued these checks, it knew that the claimants named as payees were not claimants in truth or in fact, knew that it owed them nothing, knew that the checks would not be delivered to them, knew that Noland intended to steal the checks, knew that he intended to forge the endorsements, negotiate the checks, and appropriate their proceeds. In short, appellee insists that the Brady Company was charged with all of this knowledge and these intentions of Noland, and was, in fact, a participant in his fraudulent and criminal scheme.

We cannot subscribe to such doctrine. Appellee urges that the cashier was but an automaton, a mechanical device, or marionette, as it were, without mind or intention, operated by Noland. It argues that "the only possible 'intention' attributable to Irene Lamuth was the intention to write and sign whatever checks Noland directed." Certainly she did as he directed. She drew and signed the checks according to the claim sheets which he presented to her. But she did not do this because of, or with, the secret knowledge or intention of Noland, which he carefully refrained from disclosing to her. Not only did he not disclose to her his criminal knowledge and purpose, but in the presentation of the files he expressly represented to her, by so doing, that the claimants were bona fide creditors of the company who were entitled to the checks and would receive them. Her intention was not his intention, and could not possibly be, under this record. His knowledge was not her knowledge. He deceived her as to both his knowledge and intentions. Her intention was clear and specific. She testified that in executing these checks to the order of the various payees she had in mind actual and not fictitious or nonexisting persons as payees, and that in no single instance did she think that the payee was not to have the check. She was authorized to draw, sign, and issue these checks. Whatever she did with respect to them was within the scope of her duties and her accustomed course of conduct. Her knowledge, her intentions, her acts,

were the knowledge, intentions, and acts of the Brady Company, with which it was charged and for which it is liable. But it is not charged with or responsible for the knowledge, intentions, or acts of Noland, wholly outside the line of his duties and the scope of his authority, in the prosecution of a plan destructive of its rights and property. His knowledge and intention with respect to the fictitious character of the payees in these checks were not those of the drawer of the checks, and the checks were, therefore, not payable to bearer. The doctrine of constructive or imputed notice, based on the presumption that an agent or employee communicates to his principal or employer all material facts concerning the business of the agency or employment, has no application here, because Noland could not in reason be presumed to have disclosed to the Brady Company that which would have defeated his fraudulent purpose. As Pomeroy has said in his great work on Equity Jurisprudence, section 675:

" * * * when an agent * * * has, in the course of his employment, been guilty of an actual fraud contrived and carried out for his own benefit, by which he intended to defraud and did defraud his own principal * * *, and the very perpetration of such fraud involved the necessity of his concealing the facts * * * then, under such circumstances, the principal is not charged with constructive notice of facts known * * * and thus fraudulently concealed. In other words, if in the course of the same transaction in which he is employed the agent commits an independent fraud for his own benefit, and designedly against his principal, and it is essential to the very existence or possibility of such fraud that he should conceal the real facts from his principal, then the ordinary presumption of a communication from the agent to his principal fails; on the contrary, a presumption arises that no communication was made, and consequently the principal is not affected with constructive notice."

It is horn-book law that when an agent or employee abandons the object of his agency or employment, and acts for himself, by committing a fraud upon his principal or employer for his own exclusive benefit, he ceases to act within the scope

of his agency or employment, and to that extent ceases to act as agent or employee. 2 Am. Jur., Agency, 298, section 379; Farnsworth v. Hazelett, 197 Iowa 1367, 1374, 199 N. W. 410, 38 A. L. R. 814; 3 C. J. S., Agency, 202, section 269; Templeton v. Stephens, 212 Iowa 1064, 1072, 233 N. W. 704; Hummel v. Bank of Monroe, 75 Iowa 689, 692, 37 N. W. 954; Laird & Keehner v. McCord, 196 Iowa 972, 976, 195 N. W. 517.

A leading case, many times quoted, which is "on all fours" with this case, is Los Angeles Inv. Co. v. Home Savings Bank, 180 Cal. 601, 605, 182 P. 293, 295, 5 A. L. R. 1193. Plaintiff did an extensive real-estate business. It had a separate department which operated as a solicitor and broker of fire insurance. One Emory was the manager of this department, the operation of which required the disbursement of much money by checks. He had no authority to sign checks, but was authorized to requisition checks as needed from the officers authorized to sign them. Over a period of a year and a half he succeeded in thus procuring twenty or more checks in payment of ostensible demands against the plaintiff which did not in fact exist. Some of the demands gave purely fictitious names, and others gave names of existing persons who had no knowledge of the transactions and to whom Emory had no intention of delivering the checks. Emory forged the endorsements of the payees and collected the checks of the defendant. One of the checks was payable to a bona fide claimant for a valid claim. In holding that the checks were not payable to bearer because the intent and knowledge of the principal was that of the officers who drew the checks, who had no intention of making them payable to fictitious payees, the court said:

"As to Emory, the payees, with the single exception noted, were all fictitious. The question is, Were they fictitious as to the plaintiff company? The answer to this question obviously depends upon whether Emory's intention that the checks be made payable to persons who were not to receive the paper, who were nonexistent so far as the checks were concerned, is attributable to the company. The bank's counsel in their brief say: 'But appellant did intend something when it issued the checks. What was it? It intended that the money be paid

to the person to whom Emory intended it to be paid—and the money was so paid.' This is the very crux of the matter. But is it true? Plainly it is not. Emory did not execute the checks on behalf of the company. It is the intention of the officers who did that must be taken to be the intention of the company. The execution of the checks was one within the scope of their authority, not within that of Emory. As to these officers, it is plain that they did not intend to execute checks to fictitious parties or to pay money to the person to whom Emory intended it should be paid, to wit, himself. They intended to pay money to what they believed to be existent persons, and this being so, the checks cannot be considered as made to fictitious payees. Nor is the company bound by the guilty knowledge of Emory. That knowledge was adverse to his company and such as in the nature of things he would not communicate to it. It is elementary that a principal will not be charged with knowledge of an agent under such circumstances. * * * The point in this case is that the checks were not executed by the guilty agent; we are not concerned with an act done by him within the scope of his authority, and therefore, his guilty intent and knowledge are not the intent and knowledge of his principal. The intent and knowledge of the principal was, as we have said, that of the officers who drew the checks, and they were wholly innocent of any intention of drawing checks to fictitious payees.''

It is the rule of the courts generally that it is the knowledge of the authorized person making the check, of the fictitious character of the payee, which is essential to characterize the check as one payable to bearer, under section 9 of the Negotiable Instruments Law. And it is also the recognized rule that an employee who has specified duties to perform with respect to matters preliminary to the issuance of a check, such as Noland had in the case before us, is not such a person whose knowledge of the fictitious character of a payee is attributable to his employer, who is the maker or drawer of the check.

We call attention to a number of leading authorities which fully sustain the above-stated propositions, in which the fact situation and the relation of the guilty one to his employer are of the same general character and type as in this case. See Sea-

board Nat. Bk. v. Bank of America, 193 N. Y. 26, 85 N. E. 829, 22 L. R. A., N. S., 499, 506, 508; Shipman v. Bank of State of New York, 126 N. Y. 318, 27 N. E. 371, 12 L. R. A. 791, 795, 797, 22 Am. St. Rep. 821 (the rule of the Shipman case was recently reaffirmed in Swift & Co. v. Bankers Trust Co., 280 N. Y. 135, 19 N. E. 2d 992, 994); Metropolitan Cas. Co. v. First Nat. Bk., 261 Mich. 450, 246 N. W. 178; Hartford Acc. & Ind. Co. v. Middletown Nat. Bk., 126 Conn. 179, 10 A. 2d 604, 605; Jordan-Marsh Co. v. National Shawmut Bank, 201 Mass. 397, 87 N. E. 740, 22 L. R. A., N. S., 250, 255; First National Bank v. Produce Exchange Bank, 338 Mo. 91, 89 S. W. 2d 33, 37; Continental Nat. Bk. & Tr. Co. v. Olney Nat. Bk., 7 Cir., Ill., 33 F. 2d 437, 439; United Motor Car Co., Inc. v. Mortgage & Sec. Co., Inc., 13 La. App. 385, 128 So. 307, 309; Commonwealth v. Farmers Deposit Bank, 264 Ky. 839, 95 S. W. 2d 793, 795 (the opinion cites with approval, McCornack v. Central State Bank, 203 Iowa 833, 211 N. W. 542, 52 A. L. R. 1297, and Erickson Co. v. Iowa Nat. Bk., 211 Iowa 495, 230 N. W. 342, both supra); City of St. Paul v. Merchants Nat. Bk., 161 Minn. 485, 187 N. W. 516, 518, 22 A. L. R. 1221; United States Cold Storage Co. v. Central Mfg. Dist. Bk., 343 Ill. 503, 175 N. E. 825, 74 A. L. R. 811, 814 (the opinion shows the inapplicability of Snyder v. Corn Exch. Nat. Bk., 221 Pa. 599, 70 A. 876, 128 Am. St. Rep. 780; Bartlett v. First Nat. Bk., 247 Ill. 490, 93 N. E. 337; Phillips v. Mercantile Nat. Bk., 140 N. Y. 556, 35 N. E. 982, 23 L. R. A. 584, 37 Am. St. Rep. 596; American Hominy Co. v. National Bank of Decatur, 294 Ill. 223, 128 N. E. 391); Robertson Banking Co. v. Brasfield, 202 Ala. 167, 79 So. 651, 653; American Sash & Door Co. v. Commerce Trust Co., 332 Mo. 98, 56 S. W. 2d 1034, 1041; ibid., Mo. App., 25 S. W. 2d 545.

The authorities relied upon by appellee assert no contrary principle. In fact they fully sustain it. But they are not applicable. The distinguishing and controlling factor is whether the wrongdoing employee or officer signed the checks and had authority to do so, or whether he did not sign the checks and had no authority to sign. If the latter is the case, his guilty knowledge and guilty intent will not be imputed to his em-

ployer. But if the one who executed the checks had authority to do so, and it was he that intended to defraud his employer by making the checks payable to fictitious persons or to existing persons whom he did not intend should have the checks, then whatever he thus did was within the scope of his authority as agent of his principal and was binding upon the latter. And this is true although what the agent did was done knowingly and intentionally, and in fraud of the rights of his employer or principal, and against his own interest to reveal. His knowledge, acts, and intention in such case are also those of his employer or principal. It is cases of this type which appellee has cited in support of this particular contention. They are not in point. We have already mentioned some of these cases, and called attention to how other courts have distinguished them. These cases, above mentioned, are Bartlett v. First Nat. Bk., Phillips v. Mercantile Nat. Bk., American Hominy Co. v. National Bank of Decatur, and Snyder v. Corn Exch. Nat. Bk. Other cases of the same type, cited by appellee, are Land Title & Trust Co. v. Northwestern Nat. Bk., 196 Pa. 230, 46 A. 420, 421, 50 L. R. A. 75, 79 Am. St. Rep. 717; United States v. National Exch. Bk., 7 Cir., Wis., 45 F. 163; Central Nat. Bk. v. National Met. Bk., 31 App. D. C. 391, 17 L. R. A., N. S., 520; Union Nat. Bk. & Tr. Co. v. Security-First Nat. Bk., Cal. App., 57 P. 2d 1332 (appellee stresses this case. But it does not aid it, for Williams, the culprit, was authorized to sign the checks by which he procured the cashier's checks whose endorsements he forged, and it was because of this authority that the court held that Williams' intention in designating fictitious payees in the cashier's checks was the intention of his employers and they were bound thereby. It was on this ground that the decision was affirmed by the supreme court in 8 Cal. 2d 303, 65 P. 2d 355, 356. The appellant had settled with its depositor, but it was not legally bound to. The principles announced in Los Angeles Inv. Co. v. Home Savings Bank, supra, 180 Cal. 601, 182 P. 293, 5 A. L. R. 1193, were in no way questioned or changed.); Goodyear Tire & Rubber Co. v. Wells Fargo Bank and Union Trust Co., 1 Cal. App. 2d 694, 37 P. 2d 483; Swift & Co. v. Bankers Trust Co., supra, 280 N. Y.

135, 19 N. E. 2d 992 (the decision in this is based wholly on whether the statute of New York or Illinois controlled. The latter statute had been amended to include as checks payable to bearer those issued at the request of one connected with the drawer.); Globe Indemnity Co. v. First Nat. Bk., Mo. App., 133 S. W. 2d 1066; Hartford Acc. & Ind. Co. v. Fifth-Third U. T. Co., 6 Cir., Ohio, 111 F. 2d 762; Hackensack Trust Co. v. Hudson Trust Co., 119 Misc. 689, 197 N. Y. Supp. 158. Some of those are imposter or false-impersonation cases, in which the drawer executed and delivered his check and made it payable to a person misrepresenting himself as someone else whom the drawer believed him to be and intended him to cash the check. Such cases are not fictitious-payee cases and are not pertinent. See Security-First Nat. Bk. v. United States, 9 Cir., Cal., 103 F. 2d 188, 190; Uriola v. Twin Falls Bank & Trust Co., 37 Idaho 332, 215 P. 1080; and authorities in Montgomery Garage Co. v. Manufacturers' Liab. Ins. Co., 94 N. J. Law 152, 109 A. 296, 22 A. L. R. 1224, 1228; McCornack v. Central State Bank, supra, 203 Iowa 833, 211 N. W. 542, 52 A. L. R. 1297, 1326; Cohen v. Lincoln Sav. Bk., 275 N. Y. 399, 10 N. E. 2d 457, 112 A. L. R. 1424, 1435. Appellee also cites Independent Consol. Sch. Dist. v. Crawford County Tr. & Sav. Bk., Iowa, 298 N. W. 667, 670. It does not aid the appellee. The checks were held to be payable to bearer because they were signed and issued by the school treasurer, who, under the statutes, was authorized to pay out school funds on his check as such treasurer. He knew they were payable to fictitious payees, and the court, speaking through Justice Oliver, rightly held the checks were payable to bearer. The case has no application under the facts in this case. This holding in the case was not changed on rehearing. See same case in 232 Iowa 506, 3 N. W. 2d 175.

The reason why the cases cited by appellee have no application is expressly stated in Phillips v. Mercantile Nat. Bk., supra, 140 N. Y. 556, 35 N. E. 982, 23 L. R. A. 584, 37 Am. St. Rep. 596, relied upon by appellee.

In American Sash & Door Co. v. Commerce Trust Co., supra, 332 Mo. 98, 115, 56 S. W. 2d 1034, 1041, it is said:

"When, however, the agent or employee has no such authority and does not execute the checks, but merely fraudulently induces his principal to issue them to others in good faith, the rule is otherwise, and the maker is not bound by the guilty knowledge of his employee."

That is exactly the situation in this case. These checks were not bearer paper and appellee never obtained valid title to any of them, for the purpose of collection, deposit, or in any other capacity, because they were never endorsed by the payees, but were possessed by it solely through the forged endorsements of the names of the payees.

IV. Appellee insists that the appellants have failed to prove that the appellee wrongfully converted any property of its assignor; that Brady Company, as maker of the checks, had no right of action against the appellee because there was no privity between them; that any money which appellee received it collected as the agent of its customers and it is, therefore, not liable, and that in any event, the money which it received was the money of the drawee bank, and not the money of the drawer; and that the appellant had ratified the action of the drawee in paying the checks and thereby necessarily ratified their collection by the appellee.

We find no merit in the conclusions which the appellee deduces from these propositions. The record establishes beyond any question that the endorsements of the names of the payees of the checks were forged, and that because of that fact neither the appellee nor any of the last endorsers acquired any right or title to any of the checks nor any right to receive payment of any such check from the drawee. This necessarily follows because of the provisions of section 9483 (section 23 of the Negotiable Instruments Law), Code, 1939, to wit:

"Forged signature—effect of. Where a signature is forged or made without the authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against any party thereto, can be acquired through or under such signature, unless the party against whom

it is sought to enforce such right is precluded from setting up the forgery or want of authority.''

We have already disposed of appellee's contention that it received the proceeds of the checks simply as a collecting agent for its customers. It received such proceeds as its own property and wrongfully exercised dominion over the money so received to the deprivation and injury of the one rightfully entitled to its possession and ownership. In doing so the appellee was guilty of converting the property. This has been the uniform holding of the courts generally. In North and South Wales Bank v. Macbeth, 77 L. J. K. B., N. S., 464, 3 Brit. Rul. Cas. 748, the syllabus states:

''The drawer of a cheque induced by the fraud of W. drew the cheque to the order of K., an existing person, and intended him to be the payee. W. forged K.'s indorsement, and paid the cheque into his own account at his bankers, who received the amount of the cheque from the drawer's bank. Held, that the drawer could recover the amount of the cheque from W.'s bankers.''

In Underwood v. Bank of Liverpool, 1924, 1 K. B. 775, 791, Scrutton, L. J., said:

''Now bankers who collect borrow from their customers the proceeds when collected, and in collecting exhaust the operation of the cheque. These operations have been held to be conversion * * *.''

At page 795, Atkin, L. J., said:

''The bank so disposed of the chattels, the cheques, as to deprive both themselves and the true owners of the dominion over them, and in exchange for the pieces of paper constituted themselves the debtors of the customer. I cannot imagine a plainer case of conversion.''

The matter for our determination is to ascertain to whom the property so converted belonged. We may at once eliminate the payees, who were named in the checks, for, with the exception of Peterson, none of them was a claimant against the

Brady Company. It was indebted to none of them, and not one of them was entitled to the check or to its proceeds. Brady Company later, on September 30, 1940, paid to Peterson the full amount of his claim ($76.25), including therein the lesser amount of $28.35 payable to him on the check issued on July 5, 1940, the endorsement of which was forged.

The appellee, while not conceding that it is liable to anyone, insists that if anyone is entitled to bring this action it is the drawee, the Fort Dodge National Bank. It is true that, unless the Brady Company has precluded itself, the drawee violated its contractual obligation to its depositor, Brady Company, in wrongfully paying the checks contrary to its order and charging them to its deposit account. And had the Brady Company not provided insurance for itself and the drawee against the loss so sustained by the forgery it could and would have required the drawee to withdraw the debits against its account, and the drawee, upon doing so, could and would have required the appellee to reimburse it for the money which it wrongfully collected from the drawee. But the drawee and the Brady Company were protected against such loss by the policies of the appellants, and were entitled to reimbursement therefor from the appellants. By the terms of the policies, the Brady Company was designated as the insured, but the drawee was also protected against loss. The policies also provided that any indemnity should be paid direct to the Brady Company. Such payment would, of course, satisfy the obligation of the insurer to both the insured and the drawee. The indemnity was paid and such payment subrogated the insurer to any and all rights of the Brady Company against anyone who caused or contributed to the loss or wrongfully received property as a result of the forgery. The assignment was but a means of evidencing the rights which the insured was entitled to as subrogee. The assignment transferred to the insurer-appellants all rights and causes of action of the Brady Company. Because of reimbursement under the policy, any loss which the latter company sustained was placed upon its insurer. The Brady Company had been the loser. It was the real party in interest.

"A party is to be regarded as the real party in interest

whenever a payment to him would protect the defendant from the claims of third persons." (Citing cases.) American Exchange Nat. Bk. v. Yorkville Bank, 122 Misc. Rep. 616, 627, 204 N. Y. Supp. 621, 631.

It is true that when it deposited its cash or its checks or other commercial paper entitling it to money, in its depository bank, the specific items deposited became the property of the bank and the depositor was not thereafter entitled to this specific property. The title thereto became vested in the bank. But the bank at the same time became obligated to the depositor as a debtor in the amount of the deposit. That debt was evidenced by the balance to the credit of the depositor in its deposit account. That debt and the account evidencing it was valuable property belonging to the Brady Company. When the debt was wrongfully diminished, and that account was wrongfully depleted by transferring part of the credit to the appellee on checks which were inoperative so far as giving any rights, it was the property of the Brady Company which was wrongfully taken and converted by the appellee. It is the merest quibble to say that the Brady Company had no cause of action against the appellee. The drawee has no cause of action. Any such rights which it had because of its liability to being subjected to the enforcement of rights against it by the Brady Company now rest in the appellants under their assignment. Had there been no insurance and no assignment, the Brady Company would have sued the drawee, had it been forced to, and the latter would then have vouched in or interpleaded the appellee, so that it might have judgment over against the appellee for any judgment in favor of Brady Company against itself which it had to pay. All such litigation would have been for the benefit of the Brady Company. The present action accomplishes this same purpose and end. Having adjusted the liability of the drawee to itself, it could have sued the appellee direct. Its assignor, therefore, has the same right. The appellee had no right to the money it received. It has no right to say that it shall be sued by the drawee, particularly when the latter has no cause of action against it, rather than by the Brady Company or its assignee. It cannot be prejudiced. Any

judgment recovered against it in this action, and which it pays, will release it from any liability to the drawee.

■ Appellee also claims that the Brady Company ratified the act of the drawee in paying the appellee, and thereby the company deprived itself of any recourse against the appellee. Any so-called ratification was not a forgiveness or condonement of either the wrong of the drawee or of the appellee. The fact that it insured the drawee against loss, and thereby released it, did not release the appellee and did not ratify the forgery, and was not an assertion to it that it could retain the property of the Brady Company which it wrongfully converted. How can any release or waiver of action against the drawee prejudice any right of the appellee when it has no recourse or cause of action whatsoever against the drawee?

We find no authorities holding that any such ratification of the payment by the drawee or failure to proceed against the drawee is a waiver of a right of action against the collecting bank or a ratification of its wrongful appropriation or conversion of the property or of the forged endorsement. All decisions we have found hold to the contrary. As sustaining our position, see Schaap v. First Nat. Bk., 137 Ark. 251, 208 S. W. 309, 311; Allen v. Mendelsohn, 207 Ala. 527, 93 So. 416, 31 A. L. R. 1063, 1065; United States Portland Cement Co. v. United States Nat. Bk., 61 Colo. 334, 157 P. 202, L. R. A. 1917A, 145; Independent Oil Men's Assn. v. Fort Dearborn Nat. Bk., 311 Ill. 278, 142 N. E. 458; Crisp v. State Bank, 32 N. D. 263, 155 N. W. 78; Atlanta & St. A. B. Ry. Co. v. Barnes, 5 Cir., Fla., 96 F. 2d 18; Universal Carloading & Distributing Co. v. South Side Bank, 224 Mo. App. 876, 27 S. W. 2d 768; Ubowich v. Northern Trust Co., 281 Ill. App. 109; Dodge v. National Exch. Bk., 20 Ohio St. 234, 249, 5 Am. Rep. 648; California Stucco Co. v. Marine Nat. Bk., 148 Wash. 341, 268 P. 891, 67 A. L. R. 1531.

■ Appellee, in its contention that appellants could not sue it because there was no privity between them, and because the drawee was the owner of the money received by the appellee, relies upon German Sav. Bk. v. Citizens Nat. Bk., 101 Iowa 530, 70 N. W. 769, 63 Am. St. Rep. 399. In that

case the intervener had cashed a check, drawn by plaintiff on the defendant, upon a forged endorsement of the payee. The drawee charged the check to plaintiff's account. The latter sued the drawee, which notified the intervener to defend the action. It did so. It moved to change the venue to its home county since it was the real party in interest. The motion was denied upon the ground that the defendant drawee had paid out its own money to the intervener and the plaintiff had no cause of action against the intervener, and that the action was rightly brought in Scott county. Upon recovering judgment against defendant the latter sued the intervener. See Citizens Nat. Bk. v. City Nat. Bk., 111 Iowa 211, 82 N. W. 464. Such circuity of action has little to recommend it. The decision has little application in this case because of the different fact situation. The adjustment between Brady Company and its drawee bank makes an entirely different situation.

The Supreme Court of Pennsylvania, in Tibby Brothers Glass Co. v. Farmers & Mechanics Bank, 220 Pa. 1, 69 A. 280, 15 L. R. A., N. S., 519, took the same position as this court did in German Sav. Bk. v. Citizens Nat. Bk., supra, 101 Iowa 530, 70 N. W. 769, 63 Am. St. Rep. 399. The Tibby case was much criticized. See United States Portland Cement Co. v. United States Nat. Bk., supra, 61 Colo. 334, 157 P. 202, L. R. A. 1917A, 145, wherein it was held to be against the great weight of authority. There is a similar criticism in National Union Bank v. Miller Rubber Co., 148 Md. 449, 129 A. 688, 690, and in Schaap v. First Nat. Bk., supra, 137 Ark. 251, 208 S. W. 309. Criticism by annotator also is found in 15 L. R. A., N. S., 519, 521, in which the Tibby case is reported. In 1937 the Supreme Court of Pennsylvania, in Lindsley v. First Nat. Bk., 325 Pa. 393, 395, 190 A. 876, 878, reversed its holding in the Tibby case, saying:

"No fault can be found with the learned court below for following the Tibby case, as it had not been expressly overruled. We have however been asked by appellant to reconsider the ground of that decision and all agree that it cannot be sustained. It has been the subject of adverse criticism, is contrary to the decisions of nearly all, if not all, other juris-

dictions in which the question has been presented and, in the interest of that uniformity of decision desirable in the law of negotiable instruments, should now be overruled."

In the footnote on that page the court cites approximately thirty authorities which support the quoted statement of the court. In some of these cases the action was brought by the maker of the check, and in others by the payee, against the intermediate bank collecting from the drawee upon a forged endorsement of the payee's name, the rule being that the true owner of the check is entitled to recover. The court also stated:

"Plaintiff's claim is based on conversion, a wrong redressed by action in tort, or in assumpsit for money had and received; and at times by action in tort with a count for money had and received. The plaintiff may elect the form of action to be pursued."

In footnote, the court states:

"The distinction between forms of action has lost much of its former importance; the court looks at the substance."

After reference to the differences in the relation between the payee of a check and the drawee, and the payee and the collecting bank, the opinion continues, on page 397 of 235 Pa., page 879 of 190 A.:

"But in receiving a check for collection, the collecting bank gets no title to the check if the holder depositing it had none; by collecting. it, and crediting the collection to the depositor, the bank necessarily assumes dominion over it inconsistent with the payee's control over his own property; this is conversion."

Numerous actions for conversion against the collecting bank are cited in the footnote of this page of the report. Continuing, the opinion states:

"The practical advantage of allowing recovery by the payee against the collecting bank is obvious and is well stated in National Union Bank v. Miller Rubber Co., 148 Md. 449, 129 A. 688 (1925), as follows: 'Where, however, a collecting bank cashes a check on a forged indorsement, a different prin-

ciple applies. There the collecting bank on the forged indorsement acquires no title whatever to the paper because the indorsement, its only source of title, is a nullity. It therefore is wrongfully in possession of the check and in equity and good conscience holds it for the payee. If, while in possession of it, it by means of the forged indorsement collects it, then it holds the proceeds of the collection in the same way for the payee, and that relationship creates a privity between it and the payee. And if the payee elects to ratify the collection of the check by the collecting bank he may recover from it the amount collected.

" 'There may be a certain artificiality about this reasoning, but it is not only supported by the weight of authority, but the result reached by it in the end is the same which would be effected under the rule stated in Tibby v. Bank, supra, and in reaching that end it avoids a useless multiplication of litigation. For under that rule the collecting bank would be liable to the drawee; the drawee would still be liable to the drawer, the drawer to the payee, and the forger to the collecting bank.' "

With respect to avoiding a multiplicity of suits, in the case of Security Sav. Bk. v. First Nat. Bk., 6 Cir., Ky., 106 F. 2d 542, 545, 127 A. L. R. 116, the plaintiff drawee, instead of suing the last holder to whom it paid checks upon which the endorsement of the payees had been forged, by-passed the later endorsers and sued the endorser immediately following the forged endorsement. In holding this to be proper, the court said:

"In such event, the last holder may recover from any prior indorser for breach of the implied warranty. Each holder may also recover in turn from his indorser as for money paid under mistake of fact. In consequence, the loss will eventually rest upon the first indorser subsequent to the forged indorsement. Inasmuch, therefore, as the appellee [plaintiff] is entitled to recover the money paid, and the loss must ultimately fall upon the appellant, a direct recovery by appellee avoids unnecessary litigation and accords with authority."

The same principle is applicable to this case. As between

all parties interested herein, the appellee is the one ultimately liable for the loss, and the appellants are the ones to be reimbursed. So long as the appellee has no rights against anyone who is by-passed, the logical and sensible action is a direct one by the appellants against the appellee.

The Brady Company was the rightful owner of the checks in question. They never came into the possession of or became the property of the payees to whom the Brady Company issued them. No title to them ever passed to anyone else, and the title to and the ownership of them and the sums called for by them consequently never left the company. It therefore had the right to sue for the conversion of the checks and their proceeds. The appellants succeeded to that right. The right is thus stated in 2 Morse on Banks and Banking, 6th Ed., 1069, section 474 (d):

"If, before the title to a check has passed to any other person than the drawer, it be dishonestly or fraudulently obtained from him, and the money collected upon it through a forged indorsement, even though the party who finally actually collects the money is an innocent holder for value, the drawer may maintain his action to recover the amount from the party so having collected the money. Nor does it affect the drawer's right to recover that his bank has been guilty of such laches in notifying the forgery to the innocent receiver of the money as to have lost any right it might otherwise have had to recover from that receiver."

With few exceptions, all authorities agree to the right of such owner to sue the collecting bank in an action of this kind.

In 1 Morse on Banks and Banking, 6th Ed., 606, section 248 (b), the author states:

"If a negotiable instrument having a forged indorsement comes to the hands of a bank and is collected by it, the proceeds are held for the rightful owners of the paper, and may be recovered by them, although the bank gave value for the paper, or has paid over the proceeds to the party depositing the instrument for collection. * * * Talbot v. Rochester, 1 Hill (N. Y.) 295; * * * Meyer v. Rosenheim, 115 Ky. 409, 73 S. W. 1129."

See, also, Labor Bank & Trust Co. v. Adams, Tex. Civ. App., 23 S. W. 2d 814, 815, and cases cited; Good Roads Machinery Co. v. Broadway Bank, Mo. App., 267 S. W. 40, 41; Randolph on Commercial Paper, sections 1469, 1739, 1777; 6 Michie on Banks and Banking, 130, section 85; Brannan's Negotiable Instruments Law, 4th Ed., 193; annotation in 31 A. L. R. 1068 et seq. Such a rightful owner may be the payee, endorsee, drawee, or, as in this case, the drawer.

The general rule is thus stated in 7 Am. Jur., Banks, 431, section 594:

"Although not agreeing uniformly in the reasons given for their decisions, most courts hold as a general rule that an intermediary bank which receives a check on a forged indorsement and collects it from the drawee bank is liable to the drawer of the check for his loss, the bank's acceptance of the check for collection being at its peril as to a possible forged indorsement."

In support of this statement of the rule, see 9 C. J. S., Banks and Banking, 526, 527, section 254; 7 Am. Jur., Banks, 432, 433, section 597; 9 C. J. S., Banks and Banking, 738, section 356; annotator's statement in 102 A. L. R. 145, and authorities cited; Allen v. Mendelsohn, supra, 207 Ala. 527, 93 So. 416, 31 A. L. R. 1063 (assumpsit); Buckley v. Second Nat. Bk., 35 N. J. Law 400, 10 Am. Rep. 249; Blum v. Whipple, 194 Mass. 253, 80 N. E. 501, 13 L. R. A., N. S., 211, 120 Am. St. Rep. 553 (trover); Merchants Bank v. National Capital Press, 53 App. D. C. 59, 288 F. 265, 31 A. L. R. 1066, with annotations on pages 1068 et seq.; Farmer v. People's Bank, 100 Tenn. 187, 47 S. W. 234.

The same principle is expressed in Strong v. Missouri-Lincoln Trust Co., Mo. App., 263 S. W. 1038, 1041, citing in support thereof Farmer v. People's Bank, supra, 100 Tenn. 187, 47 S. W. 234; Graves v. American Exch. Bk., 17 N. Y. 205; Indiana Nat. Bk. v. Holtsclaw, 98 Ind. 85; Shaffer v. McKee, 19 Ohio St. 526; United States Portland Cement Co. v. United States Nat. Bk., supra, 61 Colo. 334, 157 P. 202, L. R. A. 1917A, 145; VanSchaack on Bank Checks, 164; Tiffany on Banks and Banking, 173–175; 2 Morse on Banks and Banking, 4th Ed., 858, sections 474, 476; Ogden on Negotiable Instruments, section 187;

2 Daniel on Negotiable Instruments, section 1663; Magee on Banks and Banking, 2d Ed., 350–356; Selover on Negotiable Instruments, 2d Ed., section 243; Schaap v. First Nat. Bk., 137 Ark. 251, 208 S. W. 309.

We call attention to some other cases in which a direct action was brought for the drawer of a check and recovery allowed against an intermediate bank which had collected from the drawee bank on checks or drafts held by the collecting bank on a forged endorsement of the payee. Some of them were brought for conversion; others for money wrongfully received, or received by mistake, or on implied warranty, or on endorsements. See Gustin-Bacon Mfg. Co. v. First Nat. Bk., 306 Ill. 179, 137 N. E. 793 (drawer) ; Life Insurance Co. v. Edisto Nat. Bk., 166 S. C. 505, 165 S. E. 178, 180 (drawer) ; First Nat. Bk. v. Guaranty L. Ins. Co., 45 Ga. App. 289, 164 S. E. 212 (drawer) ; State v. Merchants Nat. Bk., 145 Minn. 322, 177 N. W. 135 (drawer) ; Labor Bank & Trust Co. v. Adams, supra, Tex. Civ. App., 23 S. W. 2d 814 (drawer of check which was intercepted before reaching payee, and on which payee's name was forged, sued drawee, which interpleaded the collecting bank; held entitled to recover amount of check from collecting bank which collected the sum on forged endorsement from drawee and paid such fund over to person presenting check, since, under Negotiable Instruments Law, section 23, the forged endorsement is wholly inoperative) ; Insurance Company of North America v. Fourth Nat. Bk., D. C., N. D. Ga., 12 F. 2d 100 (drawer) ; National Surety Co. v. Halsted Street State Bank, 246 Ill. App. 92 (insurance company as assignee of the drawer of a draft may hold a collecting bank liable for money paid to the company's agent on the forged endorsements of drafts made to policyholders) ; United States Fidelity & Guaranty Co. v. First Nat. Bk., Tex. Civ. App., 93 S. W. 2d 562 (assignee of drawer) ; P. & H. Finance Co. v. First State Bank, 185 Okla. 558, 94 P. 2d 894, 895 (collecting bank had refunded money collected by it on forged endorsement to the drawee, where it was recredited to the drawer; held it was not entitled to recover said money from the drawer) ; Greenville Nat. Exch. Bk. v. Nussbaum, Tex. Civ. App., 154 S. W. 2d 672 (drawer) ; Wash-

ington Mechanics Sav. Bk. v. District Title Ins. Co., ·62 App. D. C. 194, 65 F. 2d 827 (check payable to one DeViele was stolen before delivery from desk of drawer; held drawer had cause of action against bank which collected it from the drawee on the forged endorsement of the payee) ; City Bank v. Hamilton Nat. Bk., 71 App. D. C. 225, 108 F. 2d 588, 589 (plaintiff bank recovered from defendant bank on former's cashier's checks which latter had collected on forged endorsements of payees. The court said: "To the same extent, the drawer of a check may recover from the collecting bank when his own bank has paid and charged to his own account a check with a forged indorsement. [Citing Life Insurance Co. v. Edisto Nat. Bk., supra, and Gustin-Bacon Mfg. Co. v. First Nat. Bk., supra.] Or the drawee bank may credit the account and itself sue the collecting bank. District Nat. Bk. v. Washington Loan & Tr. Co., 62 App. D. C. 198, 65 F. 2d 831") ; Railroad Building, Loan, & Sav. Assn. v. Bankers Mortgage Co., 142 Kan. 564, 51 P. 2d 61, 102 A. L. R. 140 (syllabus: "Where a check to which the name of the payee is indorsed without authority of the person whose signature it purports to be is paid or cashed or received for value by a bank, which indorses it and sends it forward for collection to the drawee bank, where it is paid, the drawer, upon discovery of the fraudulent indorsement, may, in an appropriate action, recover from the first bank.") ; Farmers State Bank v. United States, 5 Cir., Tex., 62 F. 2d 178 (syllabus: "Where bank paid checks on forged indorsements of payee, and indorsed checks for collection, proceeds held received by bank for use of maker, entitling maker to recover against bank.") ; Figuers v. Fly, 137 Tenn. 358, 374, 193 S. W. 117, 121 (drawer), ("Ordinarily such true owner is the payee, but in the circumstances of the instant case it might be, at his election, complainant Figuers who drew it [check] and parted with it by reason of vitiating fraud; and had complainant's suit been against the Phoenix· Bank alone [collecting bank], [The complainant took the inconsistent position of suing drawee and the collecting bank.] based on this theory and the particular facts of this case, he would have been entitled to recover, it seems.") ; Real Estate-Land Title & Trust Co. v. United Sec. & Tr. Co., 303 Pa. 273, 154 A. 593 (drawer).

The rights of the appellants, as the assignees of Brady Company, the drawer of the check, are not unlike the rights of the payee of a check against a bank which took it on a forged endorsement of the payee and collected it from the drawer. Such a payee may recover the amount of the check from the collecting bank although there is no privity, in the usual sense, between them. Such a payee could, of course, sue the drawer on the debt for which the check was given, but he is not required to. In speaking of such right of action in the payee, the court, in Universal Carloading & Distributing Co. v. South Side Bank, supra, 224 Mo. App. 876, 881, 27 S. W. 2d 768, 771, a conversion case, said:

"The reason for the rule permitting recovery is given in a number of cases as resting upon ratification by the payee of the collection of the check. It is said that the owner thereby releases the maker of the check and the drawee bank. We take it that the ratification referred to does not mean ratification in toto, but only a ratification pro tanto as may be sufficient and necessary to release the drawer of the check and the drawee bank by an affirmance of the payment made by them. Such ratification and affirmance is no aid to a wrongful intervenor. This reason appears to have weight and wide recognition, but in our judgment can well be supplemented by another of equal or greater force, to-wit: the breach of duty which the intervening bank owes to the owner of the check to ascertain the verity of the indorsement."

For other authorities supporting the right of the payee to sue, and the principle or reasons on which it is based, see, Independent Oil Men's Assn. v. Fort Dearborn Nat. Bk., supra, 311 Ill. 278, 142 N. E. 458 (a suit in assumpsit which the court held could have been in trover) ; Farmer v. People's Bank, supra, 100 Tenn. 187, 47 S. W. 234; Crisp v. State Bank, supra, 32 N. D. 263, 155 N. W. 78 (conversion) ; Wagner Trading Co. v. Battery Park Nat. Bk., 228 N. Y. 37, 126 N. E. 347, 9 A. L. R. 340 (conversion) ; Higgin Mfg. Co. v. Foreman Bros. Bkg. Co., 222 Ill. App. 29 (conversion) ; Fidelity & Deposit Co. v. Fort Worth Nat. Bk., Tex. Com. App., 65 S. W. 2d 276 (action for

money received; defendant held liable to assignee of payee, reversing Tex. Civ. App., 48 S. W. 2d 694, cited by appellee herein); Washington Mechanics Sav. Bk. v. District Title Ins. Co., supra, 62 App. D. C. 194, 65 F. 2d 827 (conversion); Atlanta & St. A. B. Ry. Co. v. Barnes, 5 Cir., Fla., 96 F. 2d 18 (holds action may be for conversion or for money had and received). See, also, 9 C. J. S., Banks and Banking, 763, and statement of annotator in 31 A. L. R. 1071.

▬▬▬ It is our conclusion that Brady Company was the real owner of the checks involved herein and all proceeds collected thereon; that the appellee never had title to the checks or the money which it collected through them, and wrongfully appropriated and converted the same; that no act by the Brady Company could be considered a ratification of the forged endorsement or of any wrongful act upon the part of the drawee or of the appellee so as to be a bar to its recovery of the property converted by the appellee; that privity between the Brady Company and the appellee was not essential to the maintenance of an action of conversion by the appellants; and that appellants fully established all essential elements of their action including the amount of their damages or the value of the property, which under the record is the aggregate amount or face of the checks which they received from the drawee, with interest.

▬▬▬ It is our further conclusion that the holding in German Sav. Bk. v. Citizens Nat. Bk., supra, 101 Iowa 530, 70 N. W. 769, 63 Am. St. Rep. 399, that the drawer of a check upon its depository bank cannot maintain an action of recovery against another bank which obtains possession of said check through the forged endorsement of the payee, and which collects the same from the drawee and thereby depletes the amount of the drawer's deposit account, is unsound and is contrary to all authority. The holding has never been reaffirmed by this court. It results in unnecessary litigation and serves no good purpose. To say that a bank which has expended money deposited and charged it to the depositor's account remains the owner thereof is not only a novel proposition but a quite technical and an unsound one. It might leave the depositor in a precarious position to hold it could not sue the collecting bank if the drawee should

refuse to proceed against the latter or should become insolvent. There would be sound basis for appellee's position if the drawee had recredited the depositor's account in the amount it had been debited. The holding in said case is overruled.

 V. Appellee has alleged in its answer and urged in its argument that it is entitled to the benefit of the rule that where one of two innocent persons must suffer loss by reason of the wrongful act of a third, he by whose act or omission it happened must bear the loss. As stated in Holmes v. Trumper, 22 Mich. 427, 432, 7 Am. Rep. 661, 664:

"This principle is one of quite general application, and where properly understood and limited, it is one of manifest equity; but it has many limitations and qualifications."

It has no application in this case, because the facts do not bring it within the premises of the maxim. According to the assertion of each party, the other was not without fault. Appellee insists that the Brady Company was negligent in a number of respects, and the appellants argue that the appellee was required at its peril to pay only, in accordance with the direction of the check, to the one entitled to be paid, and that it wrongfully failed to do so. It is not a question of comparative negligence. The appellee cannot relieve itself by showing its good faith or its exercise of care. The burden was upon it to deal only with the rightful holder of the check. Paying or extending credit to another would be done at its peril. As will be discussed in a later division of this opinion, it could have protected itself. It was at fault in not doing so. It is not an innocent person within the purview of the maxim. Speaking of the rule, the Washington court, in Bank of California v. Danamiller, 125 Wash. 255, 215 P. 321, 36 A. L. R. 753, stated the financial injury should be placed upon the party who had it in his power to transact the business in such a way that no person need have been hurt. The appellee had it in its power to so transact the business, but it paid no attention to the prior endorsements on the check and relied wholly upon the endorsements and the responsibility of the last endorsers, most of whom were business men who were depositors with it. It may recover against these last endorsers. The burden is upon the appellee to establish not merely negli-

gence on the part of Brady Company but proximate negligence. The maxim cannot aid it since the fault and the causal negligence lay with it.

We may note, by way of dictum, that, if the rule were pertinent, there is a well-recognized exception that it does not apply where the wrong was accomplished through the instrumentality of a criminal act. See 21 C. J., Estoppel, 1170, section 176; 31 C. J. S., Estoppel, 330, section 103, citing numerous supporting decisions, among them Knoxville Nat. Bk. v. Clark, 51 Iowa 264, 272, 273, 1 N. W. 491, 33 Am. Rep. 129, recognized as a leading case. See, also, Peoples Trust Co. v. Smith, 215 N. Y. 488, 109 N. E. 561, L. R. A. 1916B, 840, Ann. Cas. 1917A, 560 (opinion by Cardozo, J.); Holmes v. Trumper, supra, 22 Mich. 427; 7 Am. Rep. 661, 664, 665; Exchange Nat. Bk. v. Bank of Little Rock, 8 Cir., Ark., 58 F. 140, 142, 22 L. R. A. 686 (able opinion by Sanborn, J.); Glasscock v. First Nat. Bk., 114 Tex. 207, 266 S. W. 393, 395, 36 A. L. R. 320 (citing Knoxville Nat. Bk. v. Clark, supra, with approval); Societe Generale v. Metropolitan Bank, 27 L. T. 849 (forgery); Barbee v. Amory, 106 W. Va. 507, 146 S. E. 59 (forgery); Walsh v. Hunt, 120 Cal. 46, 52, 52 P. 115, 39 L. R. A. 697 (forgery); Pennsylvania Co. v. Franklin Fire Ins. Co., 181 Pa. 40, 37 A. 191, 193, 37 L. R. A. 780 (forgery); annotation in 78 A. L. R. 471 et seq.; First Nat. Bk. v. Barnes, 44 Idaho 167, 255 P. 907; Insurance Company of North America v. Fourth Nat. Bk., supra, D. C., N. D. Ga., 12 F. 2d 100, 102.

VI. We have stated that Noland was a convicted forger. This is the chief charge of negligence against the Brady Company by which the appellee seeks to preclude the appellants from availing themselves of the provisions of section 23 of the Negotiable Instruments Law, being section 9483 of the 1939 Iowa Code. The decisions which bear directly upon this element of the case are not numerous. The appellee cites Prudential Ins. Co. v. National Bank of Commerce, 227 N. Y. 510, 125 N. E. 824, 15 A. L. R. 146. The facts therein are so different from those in this case, and are so much stronger against the insurance company, that the case has little application. In that case the company knew for a number of years that its manager for Maine and New Hampshire had been using the money of

the company and its policyholders by forging the endorsement of the payee in one hundred or more checks. It had given him time to make good his defalcations, and continued him in his position.

Appellee also cites Fitzgibbons Boiler Co. v. National City Bank, 262 App. Div. 142, 28 N. Y. Supp. 2d 314. In this case the plaintiff had direct knowledge of the fraud of its assistant treasurer and credit manager. The case involved eleven checks for $6,740. It was conceded that prior to the issuance of these checks he had fraudulently caused plaintiff to issue thirty-four other checks for over $33,000. A customer gave direct notice to the treasurer of the assistant treasurer's irregular dealings with the customer. Plaintiff paid no attention to the warning and made no investigation. It elected to do nothing and the issuance of the eleven fraudulent checks involved in the action became possible. There was a judgment for the defendant. Appellee fails to state that, in spite of the strong case against the plaintiff, the Court of Appeals reversed the judgment and held that the plaintiff was not precluded under the record. The opinion appears in 287 N. Y. 326, 39 N. E. 2d 897. Motion for reargument and for a stay was denied. See 287 N. Y. 843, 41 N. E. 2d 169.

Opposed to the contention of appellee that Noland's criminal record alone was sufficient to preclude the appellants and their assignor, as provided in Code section 9483, are authorities to which we call attention. In Scott v. First National Bank in St. Louis, 343 Mo. 77, 119 S. W. 2d 929, it appears that one Meyer had worked for plaintiffs from 1920 to August 1925, as assistant cashier and bookkeeper. About the latter date it was discovered that he had embezzled $12,500. He was discharged. A week later, upon earnest solicitations and promises, he was re-employed. He went straight for about three years, and again began requisitioning spurious checks. He had a net salary of about $175 a month, which was insufficient, as he told plaintiffs, to support his family and to make payments reimbursing the bonding company. In addition, he had bought a night club for $12,000, payable in instalments, which he had improved at an expense of $20,000, to the knowledge of plaintiffs. The canceled checks, in themselves and on their faces, clearly indicated they

were irregular. The action involved forty checks with forged endorsements set out in forty counts. The trial court held the plaintiffs liable on all counts, in an action not against the collecting bank but against the drawee. The supreme court reversed as to the first fifteen counts and held the plaintiffs not precluded, under the holding of the court in American Sash & Door Co. v. Commerce Trust Co., supra, 332 Mo. 98, 56 S. W. 2d 1034. The affirmance as to the twenty-five counts was not for the re-employment of one whom the plaintiffs knew was dishonest, but because other facts clearly put the plaintiffs on notice, and, if given heed to, could have prevented the bank from cashing the checks subsequently issued. There was no such situation in the case before us.

In First Nat. Bk. v. Barnes, supra, 44 Idaho 167, 170, 225 P. 907, 908, a mother entrusted to her son a promissory note payable to her, to be placed in a vault for safekeeping. He forged her endorsement and gave it to appellant as collateral security. In an action by the bank on the note she set up the defense of forgery, and the bank contended that she was precluded because she entrusted the note to her son, who, she knew, had been at one time convicted of forgery. In finding for the mother, the court said:

"The most that can be charged against the mother is that she was careless in the custody of the note. This alone is not sufficient to preclude her from setting up the forgery, unless her carelessness was the cause of the bank's taking the note as security. [Citing authorities.] * *. * Its delivery, for this purpose, involved no representation to the public or to the bank that any transfer of the note was intended, invited or authorized. The transfer of the note by George Barnes could only be accomplished by means of the commission of a crime. * * * Conceding that the holder of an unindorsed note owes a duty not to commit its custody to one whom he knows, or has reason to believe, will use it for a dishonest purpose, it surely does not follow that one, who has committed a crime, may not reform and again become worthy of trust and confidence; * * *. 'A party is under no obligation to the rest of the world, however it may be for his own protection, to suspect a clerk or other

person appointed to represent him in his business, even though known to have been guilty of misconduct on previous occasions.' (Spencer Bower on Estoppel by Representation, sec. 91.) * * * There is no question but that it was the intervening forgery, and not the carelessness of Emma Barnes in entrusting her note to her son, that caused the bank to take the note; that the forgery, and not her carelessness, was the proximate cause of the loss. There is, therefore, no occasion for the application of the rule, invoked by the bank, that, where one of two innocent persons must suffer by the wrongful act of another, he must suffer who placed it in the power of such third person to do the wrong. This rule is not applicable to cases where the wrong is accomplished through a criminal act. In such case, the crime, and not the negligence, is the proximate cause of the loss. (21 C. J. 1172, and cases cited.)''

In Saugerties Bank v. Delaware & Hudson Co., 236 N. Y. 425, 431, 141 N. E. 904, 905, the dates were changed on bills of lading, negligently not taken up, and which were pledged as collateral security to plaintiff. Its action was dismissed and affirmed on appeal. The court said:

''Under ordinary circumstances no one is chargeable with damages because he has not anticipated the commission of a crime by some third party. * * * Bills of lading which had become absolutely stale and useless were resurrected into a condition of life by the crime of forgery and there is nothing to indicate that this offense is so common that the defendant ought to have anticipated it.''

The last paragraph of the above quotation is particularly apropos to this case. Was it reasonably foreseeable or probable that Noland would go into the files of paid claims and select certain of them and alter their top sheets and requisition checks on them? Foresight of harm furnishes the test of liability. Kapphahn v. Martin Hotel Co., 230 Iowa 739, 747, 298 N. W. 901. These previously settled claims ran into the thousands. Approximately, claims to the amount of $40,000 were disposed of each year. Was it reasonably possible that the cashier or her assistants, who had nothing to do with the claims but to issue

checks therefor, and examine the canceled checks, could have any definite recollection of the names of prior claimants, so as to detect the spurious requisitions that were interspersed among many valid ones?

Noland had been thought deserving by the board of parole of a new try at right living. He had good references. He was trusted by Brady. Naturally, his prior conviction was not publicized among the other employees, or generally. His work apparently earned him a promotion. There was nothing in the conduct of his work which indicated that he was not doing it efficiently and honestly. It was the work of his department to receive and record claims and to investigate and determine the liability of the company, the validity of each claim, and the amount to which the claimant was entitled. He handled no money and he was neither authorized to, nor did he, write any company checks. One of the purposes of punishment for crime is reformation of the wrongdoer. We may fairly assume this object is accomplished. Was Brady reasonably justified in accepting this view? Certainly the company's efforts in seeking to give such unfortunates an opportunity to regenerate themselves were laudable. It had employed many such parolees. Placing trust in them certainly would be helpful in giving them a more hopeful outlook. To adopt the principle advanced by the appellee would assuredly bring about many injustices. Supposing the company employed a driver who had been convicted of larceny, and he had taken an adding machine from his truck and sold it to the appellee. Could it successfully have said to the company that the adding machine became its property because the company should have known or reasonably anticipated that the parolee would do that very thing? Suppose a truck driver had been convicted of arson, and his truck and contents had burned. If we accede to the appellee's contention, we may expect that in such a situation in the future the insurance carrier will say, "You were negligent in employing such a driver and your negligence proximately caused the loss." We are all aware that in every community there are those who steal or burglarize. Are we to leave our doors unlocked or the windows of the home open at the peril of being denied the recovery

of property which someone may have purchased from the wrong-doer?

It is going far to say such conduct is negligent. We are not willing to go further and say that the negligence, if any, and not the intervening crime, was the proximate cause of the loss.

We call attention to United States Cold Storage Co. v. Central Mfg. Dist. Bk., supra, 343 Ill. 503, 514, 175 N. E. 825, 829, 74 A. L. R. 811, 818, a case, like so many others, to use a homely expression, almost "on all fours" with this one. The Supreme Court of Illinois, in speaking of a depositor, said:

"Nor does he owe the duty to his banker to employ none but honest clerks who will not steal his checks and commit forgeries by means of them."

Certainly he owes no greater duty to an intermediate bank. To the same effect, see Allan Ware Pontiac, Inc., v. First Nat. Bk., La. App., 2 So. 2d 76.

VII. Appellee claims negligence in not detecting the misdeeds of Noland by examining the canceled checks and the bank statements which the drawee bank periodically returned to the company. There were 8,640 checks issued by the cashier's department between February 13, 1940, and July 31, 1940, during which dates the fraudulent checks were issued. About 1, 500 checks were issued each month. They were examined once a month by the cashier and her assistants. The company, because of the contractual relationship between itself and the drawee bank, owed the latter the duty to examine the checks and the statements and compare them with its stubs and its own balance with reasonable promptness, and to notify the drawee of any errors on the face of the checks or of any forgery of the company's signatures. It was bound to do this because it had definite knowledge of all of these matters. In this case, it was impossible from any examination of the face of the checks to discover any clue to the fraudulent scheme of Noland. The checks, with respect to their faces, were just as sent out. They were just as shown by the check stubs. A drawer knows his own signature. It ordinarily has not knowledge of the signatures of the payees or other endorsers or the genuineness thereof. It may

rightly presume that the drawee or any other bank, person, corporation, partnership, etc., through whom the check has passed, has performed its duty of ascertaining the identity of these endorsers and the genuineness of their signatures. It is, therefore, ordinarily under no affirmative duty to the drawee or prior holders to scan its canceled checks for forged or unauthorized endorsements, unless there are particular circumstances requiring it. Our latest pronouncement on this is Wormhoudt Lumber Co. v. Union Bank & Trust Co., 231 Iowa 928, 2 N. W. 2d 267, 271, and authorities cited. This is the holding of all courts. See, also, McCornack v. Central State Bank, supra, 203 Iowa 833, 846, 211 N. W. 542, 52 A. L. R. 1297; Erickson Co. v. Iowa Nat. Bk., supra, 211 Iowa 495, 504, 230 N. W. 342; German Sav. Bk. v. Citizens Nat. Bk., supra, 101 Iowa 530, 70 N. W. 769, 63 Am. St. Rep. 399; National Sur. Co. v. President and Directors of Manhattan Co., 252 N. Y. 247, 169 N. E. 372, 67 A. L. R. 1113, with extensive brief commencing on page 1121; Insurance Company of North America v. Fourth Nat. Bk., supra, D. C., N. D. Ga., 12 F. 2d 100, 101, 102.

Noland never endorsed any of these checks with his own name. Any examination of the canceled checks would not have disclosed that he had anything to do with their negotiation. There was nothing about the canceled checks to arouse any suspicion. Appellee insistently urges that for almost all of the checks the company had among its old canceled checks the genuine endorsement of the payee in each of the checks in question for comparison. It is true that each of these payees, or at least most of them, had previously filed a claim and had been paid by check and had endorsed it, but it would be the acme of unreasonableness to charge the cashier with either the obligation or the capacity to identify any payee as one among the many hundreds of previous claimants.

The record does not justify our finding that the Brady Company was required to examine the checks for forged or unauthorized endorsements, or to check its files, records, and past canceled checks with respect to the endorsements. While the drawer must verify the canceled checks and statements of the drawee as above stated, it is ordinarily not required to verify

each check with its records in the particular transaction. As stated in American Sash & Door Co. v. Commerce Trust Co., supra, 332 Mo. 98, 122, 56 S. W. 2d 1034, 1045, the drawer "was under no duty to compare the checks with its office records." Also, in Detroit Piston Ring Co. v. Wayne County & H. S. Bk., 252 Mich. 163, 180, 233 N. W. 185, 191, 75 A. L. R. 1273, the court said:

"It was also argued that plaintiff was negligent in failing to compare the returned checks with the employment cards or the time cards. This would have disclosed the forgeries, but we do not believe the depositor has a duty to compare his returned checks with any of the records of his office except his check book or register."

VIII. Was there any other negligence, by commission or omission, or conduct or representations which might be construed as estoppel on the part of the Brady Company? We are convinced that there was not. But if it could be said that there was negligence, we are fully convinced that it was not the proximate or inducing cause of any action on the part of the appellee. As stated in American Surety Co. v. Empire Trust Co., 262 N. Y. 181, 186, 186 N. E. 436, 438:

"Negligent failure by the drawer to protect itself against fraud in procuring the making of the drafts does not cast upon the drawer the risk that they will be paid upon a forged indorsement."

Neither was there any conduct or representation by the company upon which appellee relied, or which deceived or misled the appellee in any relation it assumed respecting these checks. Our position is sustained by the greatly preponderant weight of precedent from courts and authorities of eminent ability, and based upon the soundest principles of law. This court has so held.

The negligence of the drawer of a check is immaterial unless it is such as directly and proximately affects the conduct of any bank, person, or other business entity through which it passes. Such is the specific holding of this court in McCornack v. Central State Bank, supra, 203 Iowa 833, 841, 211 N. W.

542, 52 A. L. R. 1297. Appellee urges as negligence the delivery of these checks to Noland for transmittal to the payees. If it was negligence, it was not proximate negligence.

In New Amsterdam Cas. Co. v. Albia State Bank, supra, 214 Iowa 541, 550, 239 N. W. 4, 8, 242 N. W. 538, we said:

"It has been held that even a negligent delivery of a check to a person other than the payee is not the proximate cause of the loss sustained by the drawee bank cashing the same upon a forged endorsement, and for the reason that there are two intervening causes of loss: First, the forgery by the wrongdoer, and second, the negligence of the bank in cashing the check."

Citing Los Angeles Inv. Co. v. Home Savings Bank, supra, 180 Cal. 601, 182 P. 293, 5 A. L. R. 1193, a leading case cited and quoted from in many cases. We mention a few of the numerous cases which sustain our holding herein. See cases cited herein in Division III holding that these checks were not bearer paper. See, also, Welsh v. German American Bank, 73 N. Y. 424, 429, 29 Am. Rep. 175; Grand Lodge v. State Bank, 92 Kan. 876, 888, 142 P. 974, L. R. A. 1915B, 815; Joseph Milling Co. v. First Bank of Joseph, 109 Or. 1, 19, 216 P. 560, 29 A. L. R. 358; New York Produce Exch. Bank v. Houston, 2 Cir., N. Y., 169 F. 785, 788 [certiorari denied 214 U. S. 525, 29 S. Ct. 703, 53 L. Ed. 1067]; Detroit Piston Ring Co. v. Wayne County & H. S. Bk., supra, 252 Mich. 163, 233 N. W. 185, 190, 75 A. L. R. 1273; Morris Plan Bank of Fort Worth v. Continental Nat. Bk., Tex. Civ. App., 155 S. W. 2d 407 (holding that the incidents with respect to acceptance of forged note upon which it relied had no causal connection, and was not a proximate cause of paying the check on a forged endorsement); Fitzgibbons Boiler Co. v. National City Bank, supra, 287 N. Y. 326, 39 N. E. 2d 897, 287 N. Y. 843, 41 N. E. 2d 169; Gutfreund v. East River Nat. Bk., 251 N. Y. 58, 167 N. E. 171, 64 A. L. R. 1103; City of New York v. Bronx County Trust Co., 261 N. Y. 64, 184 N. E. 495; Greenville Nat. Exch. Bk. v. Nussbaum, supra, Tex. Civ. App., 154 S. W. 2d 672; Macbeth v. North & South Wales Bank, 1908, 1 K. B. 13; Janin v. London & San Francisco Bank, 92 Cal. 14, 27 P. 1100, 14

L. R. A. 320, 27 Am. St. Rep. 82; United States Cold Storage Co. v. Central Mfg. Dist. Bk., supra, 343 Ill. 503, 175 N. E. 825, 74 A. L. R. 811, with annotation on "Paper as Payable to Fictitious Person," pages 822 et seq.; Scott v. First National Bank in St. Louis, supra, 343 Mo. 77, 119 S. W. 2d 929, 936, 938; Allan Ware Pontiac, Inc. v. First Nat. Bk., supra, La. App., 2 So. 2d 76. These cases hold, in substance, that the negligence or conduct, to be a defense against the negotiable instrument, must amount to a representation operating as an estoppel, and not the mere mistaken issuance of the check, or the possible cause of the forger's getting its possession. The fraud committed upon the drawer, or his negligence in not discovering the imposition upon him, and the forgery of the endorsement and the wrong committed on the collecting bank are independent torts. The latter are causes which intervene between the negligent issuance of the check and its payment.

Do the facts in this case establish that any negligence charged to the Brady Company was proximately connected with, or that any representation or conduct on its part induced or influenced, any action on the part of the appellee? Our answer must be that they do not. Appellee dwells upon the fact that the payees were fictitious misled the appellee, and increased the natural hazards and burdens resting upon it. Such contention has no basis. The appellee was under no obligation to cash or credit any of these checks. "It could pay or refuse to pay." American Express Co. v. Peoples Sav. Bk., supra, 192 Iowa 366, 371, 181 N. W. 701, 704. When it assumed this obligation it did so at its peril. It was bound for its own protection to satisfy itself that the title of the last holder, and necessarily every link in the preceding chain of title, was good. It could not relieve itself of this burden, or protect itself by relying upon the warranty of the last holder's endorsement that such was the fact, and that such holder had valid title.

In Harmon v. Old Detroit Nat. Bk., 153 Mich. 73, 78, 116 N. W. 617, 619, 17 L. R. A., N. S., 514, 126 Am. St. Rep. 467, it was held:

"Where a bank pays a forged check, or one upon which the

name of a fictitious payee has been fraudulently substituted, the fact that the check came to the paying bank through other banks does not relieve it of the duty of investigation to determine the identity of the original presenter with the payee named in the check, and if the paying bank chooses to rely upon the identification accepted by the bank which cashed the check, it does so at its own risk.'' Syllabus, paragraph 3.

In the opinion in this case it was said:

''If the drawee chooses to rely upon the identification by the bank which cashed the check, it does so at its own risk, and its recourse is upon that or some intermediate bank.'' Quoted in Grand Lodge v. State Bank, supra, 92 Kan. 876, 142 P. 974, L. R. A. 1915B, 815, and Kansas City Title & Trust Co. v. Fourth Nat. Bk., 135 Kan. 414, 10 P. 2d 896, 900, 87 A. L. R. 334.

As noted in American Sash & Door Co. v. Commerce Trust Co., supra, 332 Mo. 98, 121, 56 S. W. 2d 1034, 1044, checks put in circulation often pass through many hands, and the drawer is not expected to verify the endorsements. ''On the other hand, the bank by the simple expedient of requiring the last indorser to be identified and responsible, can protect itself.'' The bank may require that the holder furnish it security or guaranties to protect it from any loss. As said in Hays v. Lowndes Sav. Bk. & Tr. Co., 118 W. Va. 360, 366, 190 S. E. 543, 545 [quoting from Citizens Nat. Bk. v. Reynolds, 72 Ind. App. 611, 615, 126 N. E. 234, 236]:

'' 'For its own protection the bank may go further. It may refuse payment until the stranger brings in a person whom the bank knows to be financially responsible and who is willing to become an indorser.' ''

Section 9483 of the 1939 Code is simply a statutory embodiment of a rule of the ''law merchant'' evidenced by judicial decisions from the early English courts down through the years. In Tatlock v. Harris, 3 T. R. 174, 181, Lord Kenyon said:

''* * * there is no doubt, but that the endorsee of a bill of exchange, payable to order, must in deriving his title, prove the hand-writing of the first endorser.''

A forged endorsement nullifies the instrument as to all parties against whom the forgery is committed. The doctrine of bona fides does not apply to such a holder. He acquires no interest in it, although he may be ignorant of the forgery. The moment such a draft or check is paid by the drawee, the holder becomes liable as for money had and received. As a corollary to this rule, the holder of a check payable to order must trace his title through genuine endorsements, including that of the payee. See 8 Am. Jur., Bills and Notes, 318, 319, sections 604, 605; Citizens Nat. Bk. v. City Nat. Bk., supra, 111 Iowa 211, 216, 82 N. W. 464; annotation, 67 A. L. R. 1535 et seq. In California Stucco Co. v. Marine Nat. Bk., supra, 148 Wash. 341, 347, 268 P. 891, 893, 67 A. L. R. 1531, 1535, an action, just as the one before us, by the drawer of checks against the cashing or collecting bank for the conversion of such checks, which the defendant acquired through the endorsement of the payees, by the forgery of an unauthorized employee of the plaintiff, the court said:

"Error is also urged because the trial court refused to admit evidence concerning what is termed negligence upon the part of the corporation in failing to strictly supervise, watch and control the actions of Culpepper [the forger]. Negligence is no defense to an action of this character. Culpepper had no right to endorse the checks or accept the proceeds. It was not claimed that there was any evidence of even apparent authority other than his mere employment. Can one who takes from a servant that which belongs to the master be heard to say upon demand by the master for its return, 'You were negligent in trusting your servant'? The rule is that one who acts upon the endorsement of negotiable paper must ascertain its genuineness at his peril. Independent Oil Men's Ass'n v. Fort Dearborn Nat. Bank, 226 Ill. App. 570; Schmidt v. Garfield National Bank, 64 Hun (N. Y.) 298, 19 N. Y. Supp. 252."

See, also, Hortsman v. Henshaw, 11 How. (U. S.) 177, 13 L. Ed. 653; Fulton Nat. Bk. v. United States, 5 Cir., Ga., 107 F. 2d 86, 88. In the latter case, the United States, as the maker of a government check, sued the defendant cashing bank to recover the amount thereof, which the latter had paid on a

forged endorsement of the payee and collected from the government. It was not an "imposter or false impersonation" case like so many of the cases cited and relied on by the appellee, but which have no application to the case at bar. The court said:

"It was the duty of the bank to ascertain the true individual and to pay no one else. Failing in this duty it must be held liable."

In support, the opinion cites Insurance Company of North America v. Fourth Nat. Bk., supra, D. C., N. D. Ga., 12 F. 2d 100, 102. In that case the plaintiff issued drafts drawn on itself. One of its employees added his name as a payee and endorsed his name and forged the endorsement of the legitimate payee. The defendant acquired the checks and presented and collected them from the plaintiff, which later discovered the forgeries and brought the action. The court said:

"I do not perceive that the equitable doctrine ought to apply that, if one of two equally innocent parties must suffer by the act of a third, the loss should be borne by the party through whose fault the injury became possible. The fraud of a trusted agent does not always fix the loss on his innocent principal, as against the third person injured, though the principal was careless. It does so only when the principal has failed in his duty. In this case the duty to see that these indorsements were genuine was on the bank, and those under whom it took, and not on the insurance company. The insurance company is not complaining of the acts of its fraudulent agent. It is complaining of the dereliction of the bank, a dereliction which seems to me to be clearly established by law. If my agent steal goods from me and sell them to another, who in turn sells them, unrecognized, to me, and gets my money for them, could I not recover my money on discovery that the goods were mine, and not his who sold them to me? Could he reply that I should have recognized my goods, and not bought them, or should have kept them more safely, and not let my agent steal them?"

As said in Life Insurance Co. v. Edisto Nat. Bk., supra, 166 S. C. 505, 513, 165 S. E. 178, 181, [quoting 3 R. C. L. 542, section 171]:

" 'Where a check is presented by a third person with the alleged endorsement of the payee the bank must ascertain, as a general rule, at its peril, whether the endorsement is good or forged; the genuineness of the last endorsement on a check does not relieve a bank from looking to the genuineness of preceding endorsements.' "

What difference did it make, or what causal connection was there between the fact that the payees were fictitious and the duty of the appellee to see that it received and paid the checks on genuine endorsements? None whatever. The fact that the payees were fictitious, or were not bona fide claimants, and were not entitled to be paid, did not release the appellee from procuring genuine endorsements. The payees were all existing persons, and if it had insisted upon having their endorsements it would have learned that they were not entitled to be paid and it would not have accepted the checks. Its duty was not altered by the fact that the payees were not bona fide claimants. In construing section 23 of the Negotiable Instruments Law, the Alabama court, in Tarrant American Sav. Bk. v. Smokeless Fuel Co., 233 Ala. 507, 510, 172 So. 603, 605, an action for conversion by the maker of a check having a fictitious payee, against the collecting bank, on this point said:

"The construction of this statute is to the effect that a bank is bound to obtain a genuine indorsement on a check, and if it fails to do so it is liable, although the check was made to a fictitious payee. Robertson Banking Co. v. Brasfield, 202 Ala. 167, 79 So. 651; Florence et al. v. Carr et al., 226 Ala. 654, 148 So. 148; 99 A. L. R. notes p. 440, 442."

Appellee also argues that since the payees were not entitled to the money directed to be paid them as payees this defeats appellants' cause of action. It bases this contention upon the statement of this court in Erickson Co. v. Iowa Nat. Bk., supra, 211 Iowa 495, 501, 230 N. W. 342, 344, in some respects similar to this case, where the court said:

"These checks were spurious from the beginning. They never had a valid existence. The name of the payee was fictitious."

In that case pay-roll checks were, by the fraud of an employee, executed by an authorized officer, but made payable to former employees, no longer on the pay roll. The wrongdoing employee would take the checks after they were signed and endorse them and forge the fictitious payee's endorsement and collect on them. The statement of the court is inaccurate and incorrect. The payees, notwithstanding they were living persons, were, under proper legal construction, fictitious. The payees were not on the pay roll and were not entitled to wages and the wrongdoer never intended that the payees should ever get the checks. In that sense they might be called spurious. But it is not a fact that "they never had a valid existence." The Erickson Company and the officer who issued the checks had no knowledge of the fraudulent plan. They thought the payees were entitled to be paid and it was the intention of the company and the officer executing the checks that they should be paid. And if the wrongdoing employee had overlooked one of these checks and had failed to withdraw it when he received all of the checks from the officer signing them, and it had been mailed or delivered to the payee named therein and he had endorsed it and cashed it at a bank or a drug store or some place else, the Erickson Company would have been the loser and could not have recovered the amount of the check from the bank or other person cashing it. And the Erickson Company's depository bank on which the check was drawn, after it had paid it on presentment, could rightly have charged it against the company's deposit or checking account. All of the authorities so hold, and rightly so, because the cashing bank would have paid the very person named in the check whom the drawer intended should receive the check and should endorse it and should receive payment thereon. It was not the fraud in the procurement of the execution of the checks which invalidated them, but the forged endorsements. The same is true of the checks in this case. They were not invalid from their inception, but only from the time of the forgeries.

But of what avail is it to the appellee that the payees in the checks were not claimants against the company, and it was not indebted to them, and they were not entitled to the checks or their proceeds? Does that fact entitle the appellee to retain

money to which it never was entitled and of which the company was defrauded? The Supreme Court of California said in Los Angeles Inv. Co. v. Home Savings Bank, supra, 180 Cal. 601, 608, 182 P. 293, 296, quoting from Shipman v. Bank of State of New York, supra, 126 N. Y. 318, 331, 27 N. E. 371, 374, 12 L. R. A. 791, 22 Am. St. Rep. 821: " 'The defendant does not occupy any different position with reference to the checks payable to fictitious payees than it does with reference to those payable to real parties whose indorsements were forged.' "

In Robertson Banking Co. v. Brasfield, supra, 202 Ala. 167, 168, 79 So. 651, 652, it was held:

"When the instrument is not payable to bearer, but to a named person, it is the duty of the drawee bank, or one who buys the same, to procure a genuine indorsement; and the fact that the forged indorsement is the name of a nonexisting person does not afford relief against a noncompliance with its plain legal duty, and one who neglects this duty in paying out the funds of its depositors is guilty of proximate negligence. * * * Here the discharge of a plain legal duty upon the part of the paying bank would have inevitably led to the fact that the indorsement was a forgery and averted the injury, regardless of Brasfield's misplaced confidence in Kirven and the betrayal of the same by said Kirven."

In full support of the foregoing statement see Jordan-Marsh v. National Shawmut Bank, supra, 201 Mass. 397, 87 N. E. 740, 22 L. R. A., N. S., 250.

It certainly ill becomes the appellee to insist that the checks were spurious, invalid from their inception, and of no efficacy, when they were the instrumentalities by which it wrongfully depleted the deposit account of the Brady Company by almost $1,000, and appropriated that amount to itself.

The Federal District Court of the Northern District of Georgia very aptly and pertinently answered this argument of appellee, in Insurance Company of North America v. Fourth Nat. Bk., supra, D. C., N. D. Ga., 12 F. 2d 100, 102, in this language:

"But it is not pleaded here that the officer making these

drafts delivered them to imposters, or intended them for other persons of the same names. The mistake which it is said the insurance company made in issuing them was that the payees had no insurance policies, and had in fact suffered no fire loss. That the insurance company did not owe the payees anything is not itself material. If it wished to make loans or gifts by draft, it would not concern the bank. It becomes of importance only in connection with the assumed fact that it thought it was paying debts. It is not alleged that the payees were fictitious persons. Had they really indorsed the drafts and the insurance company honored them, there could not be any recourse on the bank, no matter how fraudulent the loss claims, unless the bank was implicated in the fraud.''

Appellee's argument that it is in any way aided by the fact that the payees were fictitious was answered in McCornack v. Central State Bank, supra, 203 Iowa 833, 840, 211 N. W. 542, 546, 52 A. L. R. 1297, in these words:

''Moreover, there is nothing in the record from which it could be found that McCornack's failure to ascertain that the payee of his check was a fictitious person induced or contributed to the payment of the check by the appellant. Seaboard Nat. Bank v. Bank of America, 193 N. Y. 26 (85 N. E. 829, 22 L. R. A. [N. S.] 499). As pointed out in Los Angeles Inv. Co. v. Home Sav. Bank, supra [180 Cal. 601, 182 P. 293], the forgery of the indorsement in reliance upon which the bank paid the check was distinct from the issuance of the check by McCornack, and Halverson could as easily have forged an indorsement upon a check payable to the order of a real person. * * * The drawer of a check who, through failure to discover the fraud that is being practiced upon him, makes a check payable to the order of a fictitious payee, in ignorance of that fact, stands in the same position with reference to the bank upon which it is drawn as where his check is payable to the order of a real person.''

The fact that a check is a gift of the payee, or is payable to a person not entitled to it, or to one who is entitled to it, does not alter the duty, obligation, or the care of the bank or person who cashes it. With respect to any and all such checks he must be sure of the identity of the person to whom he pays

and the genuineness of the endorsements. As in the case of any other person who seeks to avail himself of the negligence of another, he must show himself free from contributory fault or negligence. Union Tool Co. v. Farmers & Merchants Nat. Bk., 192 Cal. 40, 218 P. 424, 427, 28 A. L. R. 1417; Leather Manufacturers' Nat. Bk. v. Morgan, 117 U. S. 96, 6 S. Ct. 657, 29 L. Ed. 811; Greenville Nat. Exch. Bk. v. Nussbaum, supra, Tex. Civ. App., 154 S. W. 2d 672, 678. If he be not certain of the identity of the one presenting the check, or of the validity of any endorsement, or of the responsibility of the holder or any endorser, he may always refuse to accept the check from the holder, or if he accepts it he may require acceptable security. His protection rests wholly with himself, and if he fails to avail himself of it and loses, he can blame no one but himself and must bear the loss. His own failure is the proximate cause of his loss.

In Armstrong v. Pomeroy Nat. Bk., 46 Ohio St. 512, 523, 22 N. E. 866, 868, 6 L. R. A. 625, 629, 15 Am. St. Rep. 655, the court said:

"If the drawer of a check, acting in good faith, makes it payable to a certain person or order, supposing there is such person, when in fact there is none, no good reason can be perceived why the banker should be excused if he pay the check to a fraudulent holder upon any less precautions, than if it had been made payable to a real person; in other words, why he should not be required to use the same precautions in the one case as in the other; that is, determine whether the indorsement is a genuine one or not. The fact that the payee is a non-existing person does not increase the liability of the bank to be deceived by the indorsement. * * * The determination of the character of any indorsement involves the ascertainment of two things: (1) the identity of the indorser, and (2) the genuineness of his signature; and no careful banker would pay upon the faith of the genuineness of any name, until he had fully satisfied himself both as to the identity of the person and the genuineness of his signature. * * * where a person has a safe way and abandons it for one of uncertainty, he can blame no one but himself if he meets with misfortune."

There is no evidence that the appellee relied upon anything the Brady Company did or did not do. No witness for the appellee was called by it to testify to the circumstances attending its acceptance of any check. It was stipulated that the employees all acted in good faith and had no knowledge of the matters now complained of. But such good faith does not aid appellee. It did not know Noland, and so far as the record shows it knew none of the payees, nor why the checks were made payable to them. There is nothing to show that it knew they were claimants against Brady Company, or that it was customary for it to cash checks for such claimants, or that the company had any course of dealing with appellee, or made a single representation to it. As testified by its assistant cashier, a witness for appellants, it relied upon the responsibility and the endorsement of the customer depositing the check. All but a few were local customers and business men about town. It relied upon their responsibility to such extent that it sometimes paid them partly in cash and gave them immediate credit with the right to draw. Under such circumstances there is no reasonable warrant for a finding that the appellee relied upon or was misled by any alleged negligence or representation. The Court of Appeals in City of New York v. Bronx County Trust Co., supra, 261 N. Y. 64, 72, 184 N. E. 495, 498, in a similar case, rightfully concluded:

"It seems equally clear that the doctrine of estoppel has no application. It is a matter of common knowledge that a bank in cashing a check or in accepting it for deposit ordinarily relies only upon the responsibility of the party, usually its own customer, with whom it deals. It pays no attention to indorsements other than his. Upon no other basis could the banking business be carried on."

In 99 A. L. R. 439 et seq. is an extensive brief on the very question involved herein as to which must bear the loss, the drawer whose employee fraudulently induces him to issue a check to a person having no interest in the proceeds, or the one who cashes it on the forged endorsement of such payee by the employee. The briefmaker states the general rule to be that the loss falls upon the bank cashing the check and not upon the drawer.

The burden upon the appellee is thus stated in 8 Am. Jur., Bills and Notes, 322, section 607:

"In order that an estoppel of the right to defend on the ground of forgery may be availed of, it is necessary that the holder * * * shall have relied upon, and shall have been led to change his position by reason of, the promise, representation, conduct, or silence giving rise to the estoppel, so that, if he had not had the benefit of the estoppel, he would be prejudiced and would suffer loss and damage."

The appellee has clearly failed to establish an estoppel, or any negligence having any proximate causal connection with or relation to any action of appellee relative to the checks, or freedom from contributory negligence or fault on its part. Neither is there any evidence whatsoever that it has suffered or will suffer any loss or damage because of depositing these checks to the credit of its depositors, or that it cannot fully recoup from them any losses that it has sustained or may sustain.

The appellee places much reliance upon Erickson Co. v. Iowa Nat. Bk., supra, 211 Iowa 495, 230 N. W. 342. In that case the office manager had devised a plan of checks and balances for handling pay-roll checks, and had induced the defendant drawee bank to co-operate in the plan and to assume the methodical burden of the system. But after thus causing the drawee to relax its usual care, plaintiff made the system a mere trap by failing to perform its part in the plan. The court clearly states that its decision was based solely on the particular facts of the case, since the parties had by their conduct and understanding created "obligations quite independently of the naked and strict rule of liability which would otherwise obtain." See pages 500, 501 of 211 Iowa, page 344 of 230 N. W.

The court reversed a judgment on a directed verdict for the plaintiff and held it was a jury case. The opinion has been criticized in American Sash & Door Co. v. Commerce Trust Co., supra, 332 Mo. 98, 56 S. W. 2d 1034, 1039, and in Detroit Piston Ring Co. v. Wayne County & H. S. Bank, supra, 252 Mich. 163, 233 N. W. 185, 190, 75 A. L. R. 1273, though each case holds that under the peculiar facts the decision might be justified.

We think these particular facts and the special arrangement between plaintiff and the bank may support the decision. But it does not rule our decision in this case. There are many points of difference. The special arrangement agreed upon by the parties is lacking here. The defendant there was the drawee bank and the contractual relation existing called for a broader care and a higher degree thereof than is required between a drawer and an intermediate bank. In that case, covering a period of over three years in which seventy-two pay rolls were tampered with, four hundred and seventy-nine fraudulent checks were issued. The wrongdoer endorsed every check, thus showing his participation in the negotiation. As pay-roll clerk he kept the time sheet and prepared every check, and notwithstanding these facts, the plaintiff permitted him alone to receive the canceled checks and bank statements and examine them for errors.

That this court, by its decision therein, never intended to depart from its own holding in the McCornack case, supported by the great weight of authority, is evident from the fact that it reaffirmed its decision in the latter case, with citation of leading authorities in New Amsterdam Cas. Co. v. Albia State Bank, supra, 214 Iowa 541, 550 et seq., 239 N. W. 4, 242 N. W. 538.

IX. Appellee makes some contention by reference to a concurring opinion of Justice Stevens in the McCornack case, supra, 203 Iowa 833, 849, 211 N. W. 542, 52 A. L. R. 1297, apparently on the theory that section 9521, Code, 1939 (section 61 of the Negotiable Instruments Law) has some application to the case, and that neither a drawee nor a drawer is a holder in due course; and quotes from First National Bank v. Marshalltown State Bank, 107 Iowa 327, 329, 77 N. W. 1045, 44 L. R. A. 131: ''* * * the drawee bank is to be deemed the place of final settlement, where all prior mistakes and forgeries shall be corrected and settled once for all; and if overlooked, and payment is made, it must be deemed final.'' The latter case has no application whatsoever. It has to do with the *forged signature of the maker* of a check and not with forged endorsements. It merely follows the rule of the ancient case of Price v. Neal, 3 Burr. 1355, that a drawee of a check or the acceptor of a bill

of exchange is presumed to know the signature of the drawer, and that as between the drawee and the good-faith holder of a check, if payment is made by the drawee to the latter, it must be deemed final and cannot be recovered back. Such cases, and there are many of them, simply apply the well-established rule that if a bank pays a check purporting to be drawn on it by its depositor, but on which the maker's signature is forged, the drawee bank must stand the loss as against a good-faith holder. It is based upon the presumed negligence of the drawee in failing to meet its obligation to know the signature of its depositor, and if on presentment it pronounces it valid and pays it, it must suffer the result of its negligence. It has been a rule of the law merchant since its pronouncement by Lord Mansfield in 1762. It is an exception to the general rule that money paid under a mistake of fact may be recovered. (Goddard v. Merchants Bank, 4 N. Y. 147; First National Bank v. Bank of Wyndmere, 15 N. D. 299, 108 N. W. 546, 10 L. R. A., N. S., 49, 52, 125 Am. St. Rep. 588.) The rule, however, has no application to forged endorsements, for the good reason that the drawee ordinarily has less opportunity to know the signatures of endorsers than the holder. The drawee, ordinarily, has no means of checking or knowing the validity of endorsements of strangers, and therefore, if after payment it develops that there was a forged endorsement, the drawee has a right to look to the one to whom payment was made or to any prior endorser after the forged one for reimbursement.

The rule is stated in a headnote to brief in L. R. A. 1916E, 539, thus:

"The rule is that a drawee is entitled to recover from a party obtaining money from it on a check where there is a prior indorsement on the check that is forged. * * * The rule that a bank is required and bound to know its depositors' signatures does not apply to the signature of an indorser."

Many cases are cited fully sustaining the rule. See, also, 9 C. J. S., Banks and Banking, 761, section 357-b(3), id. 770, section 358-c(1) and cases cited; Bergman v. Avenue State Bank, 284 Ill. App. 516, 1 N. E. 2d 432, 435, 436.

On this particular point we note a decision by the United States Supreme Court, announced March 1, 1943, in an action by the United States, as the *maker* of a check, against the Clearfield Trust Company and J. C. Penney Company. The latter had cashed a check which had been mailed to a WPA worker, who never received it. The one who presented it falsely claimed to be the payee and forged the latter's endorsement. The check passed to the Clearfield Trust Company, which collected it from the Federal Reserve Bank of Philadelphia. The plaintiff notified the Trust Company in January 1937, and demanded payment in August 1937, but did not sue until 1939. The district court dismissed the complaint, but the Circuit Court of Appeals reversed, United States v. Clearfield Trust Co., 3 Cir., Pa., 130 F. 2d 93, and the United States Supreme Court affirmed the reversal, Clearfield Trust Co. v. United States, 318 U. S. 363, 370, 63 S. Ct. 573, 87 L. Ed. 524. The opinion sustains our holding herein that the doctrine of Price v. Neal, 3 Burr. 1355, and First National Bank v. Marshalltown State Bank, 107 Iowa 327, 77 N. W. 1045, 44 L. R. A. 131, both supra, has no application to checks collected on forged endorsements. It also holds, as we do in Divisions X and XI hereof, that delay in notifying the collecting bank, even though unreasonable, is no defense, because "damage occasioned by the delay must be established and not left to conjecture." Speaking of an authority which held injury may be presumed, the court said:

"But we do not think that he who accepts a forged signature of a payee deserves that preferred treatment. *It is his neglect or error in accepting the forger's signature which occasions the loss. * * * No such damage has been shown by Clearfield Trust Co. who so far as appears can still recover from J. C. Penney Co.*" (Italics ours.) .

In Citizens Nat. Bk. v. City Nat. Bk., supra, 111 Iowa 211, 215, 216, 82 N. W. 464, 465, we said:

"While the drawee, for reasons stated in First Nat. Bank of Marshalltown v. Marshalltown State Bank, 107 Iowa, 327, is bound, in the absence of fraud, to detect the forgery of the drawer's signature to a check or draft before payment, he is not charged with knowledge of the genuineness of any other

signature on the instrument. This is evidently because of the superior advantages for investigation possessed by the indorsee. The latter acquires no title to a check or draft under a forged indorsement, and, the moment it is paid by the drawee, becomes liable as for money had and received."

Justice Evans, in his dissenting opinion in the McCornack case, 203 Iowa 833, 873, 211 N. W. 542, 559, 52 A. L. R. 1297, aptly answers the contention referred to in the concurring opinion, thus:

"It is urged, however, in the concurring opinion that the payment of the check retired it, and in effect canceled all its indorsements. Of course, the payment of a check by a drawee to its *true holder* is a complete execution and performance of the contract of every indorser, and of the maker as well. But the payment of the amount of a check to a person who has no title to it (as is assumed herein by the majority) does not retire the check, nor does it have any legal effect upon its indorsers nor upon the maker."

The appellants herein are claiming no rights under any endorsement of the collecting bank. It made no endorsement, and none was necessary to entitle the appellants to recover from the appellee. As stated in Leather Manufacturers' Nat. Bk. v. Merchants Nat. Bk., supra, 128 U. S. 26, 34, 9 S. Ct. 3, 4, 32 L. Ed. 342, with respect to a check paid on a forged endorsement of the payee:

"One who, by presenting forged paper to a bank, procures the payment of the amount thereof to him, even if he makes no express warranty, in law represents that the paper is genuine, and, if the payment is made in ignorance of the forgery, is liable to an action by the bank to recover back the money which, in equity and good conscience, has never ceased to be its property. It is not a case in which a consideration, which has once existed, fails * * * but there is never, at any stage of the transaction, any consideration for the payment. * * * Whenever money is paid upon the representation of the receiver that he has either a certain title in property transferred in consideration of the payment, or a certain authority to receive the money paid,

when in fact he has no such title or authority, then, although there be no fraud or intentional misrepresentation on his part, yet there is no consideration for the payment * * *.''

With respect to such liability of the collecting bank, the court, in Railroad Building, Loan, & Sav. Assn. v. Bankers Mortgage Co., supra, 142 Kan. 564, 568, 51 P. 2d 61, 64, 102 A. L. R. 140, 144 (see, also, annotation on question, pages 145 et seq.), the court said:

''And it would have had the same liability if it had transferred the check by delivery, for, as was said in Rucker v. Hager et al., 117 Kan. 76, 79, 230 P. 70: 'The warranty of one who transfers a negotiable instrument by delivery is as much a contract that enumerated facts in relation to the paper are as promised, as if the warranty were written upon the instrument and were signed by the warrantor.' ''

See, also, Farmers State Bank v. United States, supra, 5 Cir., Tex., 62 F. 2d 178, 179; Hartford-Connecticut Tr. Co. v. Riverside Tr. Co., 123 Conn. 616, 197 A. 766, 771; Security Sav. Bk. v. First Nat. Bk., supra, 6 Cir., Ky., 106 F. 2d 542, 544, 545, 127 A. L. R. 116; White v. Continental Nat. Bk., 64 N. Y. 316, 320, 21 Am. Rep. 612, 615 (''The presentation of the bill, and the demand and receipt of the money thereon, was equivalent to an indorsement. The drawees had a right to act upon the presumptive ownership of the defendant as the apparent holder.''); Hartford Acc. & Ind. Co. v. Middletown Nat. Bank, supra, 126 Conn. 179, 10 A. 2d 604, 605; Metropolitan Cas. Co. v. First Nat. Bk., supra, 261 Mich. 450, 246 N. W. 178, 179.

Such rights as the drawee would have had, and which the Brady Company had, and the appellants have, exist under common law and the law merchant, as well as under section 23 and other provisions of the Negotiable Instruments Law. For confirmation thereof see State Planters Bk. & Tr. Co. v. Fifth-Third Union Tr. Co., 56 Ohio App. 309, 314, 10 N. E. 2d 935, 938, where the court states:

''The answer, however, meets the petition not only upon the plane of statutory obligation, but upon the plane of the

common-law warranty, which, it is true, is included in the obligation of guarantee imposed by the Negotiable Instruments Law [General Code, section 8106 et seq.] as well as the Law Merchant. This common-law warranty that the thing delivered is what it purports to be does not depend upon the act for its recognition, although the warranty and guarantee are both included within the purview of the statutory liability implied from the words commonly constituting a commercial indorsement. Such common-law liability would exist even if the act were repealed.''

Certainly, when anyone presents to a drawee bank for payment a check to which he has no title, and which under the statute is inoperative and cannot be enforced, he is not entitled to retain the money which has been received without any consideration, in an action therefor by the drawee, the drawer, the true owner thereof, or anyone standing in the place of any such one.

X. Appellee asserts that appellants have no cause of action because the checks in question were not returned to it by the drawee, Brady Company, or the appellants. The appellee knew of the claimed forgeries in late September 1940. A letter from the appellants' then attorney, calling attention to the checks, asserting the appellee's liability on them and demanding reimbursement therefor, with the statement that the canceled checks were available for examination by the appellee or its attorney, was received by the appellee on February 24, 1941, but was ignored. No further tender of the checks was necessary. Since the appellee refused to meet the demand of payment contained in the letter, the appellants were entitled to keep the checks for the prosecution of this action. There is no merit in this alleged defense. This was the holding of the Georgia court in Yatesville Banking Co. v. Fourth Nat. Bk., 10 Ga. App. 1, 7, 72 S. E. 528, 530, to wit:

''If the defendant had offered to repay the money upon the surrender of this paper, it would have been the duty of the plaintiff to surrender it; but when the defendant refused to pay we know of no reason in law or in common sense why the plaintiff should be required to give up its evidence, even though

by its retention of the paper it might deprive the defendant of that evidence which the defendant might need in order to recover from the previous indorsers."

See United States v. Clearfield Trust Co., supra, 3 Cir., Pa., 130 F. 2d 93, and United States Supreme Court opinion, supra, Clearfield Trust Co. v. United States, 318 U. S. 363, 63 S. Ct. 573, 87 L. Ed. 524.

XI. Furthermore, the appellee made no proof that it was injured in any way by reason of not receiving the canceled checks, or because of any negligence or conduct on the part of the appellants, of which it complains.

"A drawee bank must affirmatively establish prejudice as a result of the failure of the drawer to give notice of the forged endorsement upon the discovery of the forgery." New Amsterdam Cas. Co. v. Albia State Bank, supra, 214 Iowa 541, 551, 239 N. W. 4, 8, 242 N. W. 538, and cases cited.

See, also, National Surety Co. v. President and Directors of Manhattan Co., supra, 252 N. Y. 247, 169 N. E. 372, 67 A. L. R. 1113, 1119; Critten v. Chemical Nat. Bk., 171 N. Y. 219, 63 N. E. 969, 57 L. R. A. 529. As held by these and numerous other cases, there is no presumption of damage or disadvantage to the collecting bank, and the burden of affirmatively establishing the same rests on the bank.

Each side, by its motion to direct a verdict, was apparently of the mind that there were no questions but those of law, although neither thereby waived any right to go to the jury on any question. It is our judgment that there are no matters of fact for a jury to pass upon, and that the motion of the appellants to direct a verdict in their favor should have been sustained.

It is, therefore, our judgment and order that the judgment be reversed, and the cause be remanded to the district court to enter judgment for the appellants as prayed by them, and in conformity with this opinion.—Reversed and remanded.

GARFIELD, C. J., and OLIVER, HALE, MANTZ, and WENNERSTRUM, JJ., concur.

MULRONEY, J., takes no part.